850 A.2d 1226

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. JOHN KENNY DILORETO, DEFENDANT–APPELLANT.

Argued April 27, 2004—Decided June 28, 2004.

*Frank J. Pugliese,* Assistant Deputy Public Defender, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney).

*Joseph P. Connor,* Jr., Assistant Prosecutor, argued the cause for respondent (*Michael M. Rubbinaccio,* Morris County Prosecutor, attorney).

*Steven A. Yomtov,* Deputy Attorney General, argued the cause for amicus curiae, Attorney General of New Jersey (*Peter C. Harvey,* Attorney General, attorney).

Justice VERNIERO delivered the opinion of the Court.

Relying on information supplied by the National Crime Information Center (NCIC), the police in this case believed that defendant was an "endangered" missing person when they discovered him apparently asleep in a parked car. The officers awakened defendant, conversed with him, and then asked him to exit the car. The officers decided to place defendant in their police vehicle while they awaited confirmation of his status as a missing person. Before doing so, they patted down defendant's outer clothing, discovering a loaded ammunition clip in his pocket. That discovery ultimately led to the retrieval of a handgun from defendant's car. We affirm the Appellate Division's judgment upholding the warrantless seizure of those objects against defendant's constitutional challenge.

I.

We derive our summary of facts largely from testimony presented at a suppression hearing conducted by the trial court. On March 19, 1998, defendant's brother reported defendant as a missing person to the police department in Jefferson Township, Morris County. The police, in turn, reported defendant's name to the NCIC, which houses a national network of information authorized by Congress and made available to federal and local criminal justice agencies. *See* 28 *U.S.C.* § 534.

In their initial report to the NCIC, the police considered defendant to be "a missing person with involuntary status." That designation was changed after a detective from the county prosecutor's office reviewed it and determined that defendant's status should have been denominated as "endangered." The detective testified at the suppression hearing:

> Endangered is the catch-all phrase that the local police departments and the State Police use regarding adult missing persons. The most important thing [is] to get a missing person into the system as missing and if they don't fit any of the other criteria, meaning disability, a catastrophic victim, or a kidnapping, we put them in under the endangered [status].

On March 21, 1998, two days after his initial call, defendant's brother again telephoned the police to inform them that defendant was no longer missing. In response, an officer attempted to remove defendant's name from the NCIC's computer database. The officer did not succeed in that effort apparently because he had entered "John K. Diloreto" into the computer rather than the exact name contained in the database, "John Kenny Diloreto." Because the NCIC's computer system rejected the attempts to cancel the Diloreto alert, defendant's name remained in the system during the period relevant to this appeal.

On April 8, 1998, at about 10:30 p.m., a police officer in Fairfield, Essex County, was on patrol in a marked police car. He spotted a vehicle in the parking lot of a hotel facing U.S. Highway 46. According to the officer, the car attracted his attention because it was parked at an angle between two other vehicles, exhaust was emanating from its tailpipe, and its windows were fogged. He also knew of reports from that location of automobile thefts and attempted suicides.

The officer ran a check of the car's license plate number using a mobile data terminal (MDT). There was a positive retrieval of data, known as a "hit," which revealed that the vehicle's last user was listed as an endangered missing person. The data also provided identifying information as well as the agency that had reported the person missing. The MDT's buzzer sounded as an alarm to the officer that the foregoing information had been

retrieved. On direct examination at the suppression hearing, the officer explained:

Q Okay. And can you tell us what an NCIC hit is in your understanding?

A It's a positive response from the NCIC information center that information that I had put into the computer was coming back with information regarding other than what was normal—a normal printout, a normal readout.

Q And you refer[red] to an alarm of some sort?

A Yes, sir.

Q Can you tell us what that was?

A The alarm was for a—it was attached to the vehicle, when I typed in the license plate it came back that—the registered owner of the vehicle, but then the alarm sounded that a person who was last occupying that vehicle was listed in the computer [as] a missing person.

Q And how does the computer give you that information? How does it display it or otherwise convey it to you?

A The information is displayed on the MDT screen itself, on the computer screen.

Q And in this particular case what was it displaying?

A It had displayed the owner of the vehicle, the registration information regarding the vehicle, and then immediately following that said missing person [ ], endangered and it gave the particulars of the person that was in the want—in the hit.

After receiving the NCIC alert, the officer called for assistance. He also noticed that the tailpipe of the parked vehicle was no longer emitting fumes and concluded "[t]hat the engine had been shut off." A second officer arrived a few minutes later.

After that arrival, the first officer approached the parked car and shone his flashlight into it. The officer testified that, without the aid of a flashlight, he "couldn't see inside the car because of the condition of its [fogged] windows[.]" He saw that a man, defendant, was inside and appeared to be asleep, leaning back with his head against the vehicle's frame or seat. The officer attempted to open the car door, but it was locked. He knocked on the car window, seemingly awakening defendant. After defendant rolled down his window, the officer asked for identification. Defendant produced a driver's license and social security card, which matched the name of the missing person.

The officer returned to his police car. He radioed his headquarters, requesting that a call be made to the police in Jefferson Township to "verify the hit." Again, the officer explained:

Q Why do you do that, verify the hit?

A To validate it, make sure that in cases of criminal wants that you're not arresting the wrong person, *but in this case it would be a welfare check to ensure the welfare and well-being of the individual named in the want.*

Q What is your understanding of the characterization of missing? When you get that over your MDT what does that convey to you? What did it convey to you in this particular situation?

A Missing person is somebody that was reported by concerned individuals as to have been missing, not being seen, an unaccounted whereabouts.

Q Now I think you've already answered this, but how did you attempt to verify that information from Jefferson?

A I requested police headquarters to contact Jefferson Police Department initially [ ] by telephone, again, to verify the missing person want. Then as a matter of departmental procedure a computer teletype is also sent to that agency requesting hit confirmation.

Q And you did this from your patrol vehicle?

A Yes, sir.

 [ (Emphasis added.) ]

After the first officer left the driver's side of defendant's car to confirm the missing person's report, the second officer began speaking with defendant. In response to the officer's question, defendant stated that he did not know that he had been reported missing. Defendant also indicated that he did not know why someone would report him missing. Asked by the officer to state his itinerary, defendant indicated that he had traveled from Jefferson Township and was headed to his father's home in Paterson. When asked why he had pulled into the hotel's parking lot, defendant stated that he was tired and wanted to sleep.

While the second officer conversed with defendant, the first officer returned to the vehicle and stated that he intended to place defendant in the officer's police vehicle while they awaited the confirming information from the Jefferson Township police. At that time, it was raining. The first officer testified that he had decided to "secure [defendant] in the back of the patrol car until Jefferson ... [got] back to us one way or the other, whether or not he's actually wanted or not." Later in his direct examination, the officer reiterated his intention in placing defendant in the police car:

Q I want to go back to the point at which you decided to place [defendant] in the back of the patrol car. And my question is what did you intend to do after placing him there, what process were you intending to go through?

A Simple verification through Jefferson Township to check on the welfare of the individual, find out why he was in the computer as a missing person, not only missing, but missing endangered with the classification of being endangered. Again, it was simply a welfare check and at this point to decide to put him in the rear of the squad car was for reasons of officer safety as well as safety to the individual.

The second officer corroborated that testimony, explaining, "[w]e determined that it would be best to have the driver exit his vehicle and be brought back to the patrol vehicle until the situation could be sorted out."

The second officer also testified that "for officer's safety as well as [defendant's] own safety I asked him to turn towards the vehicle so I could pat him down." As the officer patted down defendant's front pocket, he felt what he believed was a "large metal object[.]" According to the officer, he asked defendant to identify the object and defendant stated, "I don't know, sir." The officer indicated that the item "ran almost the length of the pocket and it felt like a very hard metal type object in the pocket." As he began to remove the item from the pocket, the officer again asked defendant to identify it. Defendant stated that it was "a clip." The officer understood that response to mean "an ammunition magazine for a handgun or any type of ammunition magazine."

After the officer removed the object and observed that it was an ammunition clip, he determined "for [his] safety as well as . . . [the other officer's] safety," that they should handcuff defendant until the pat-down search was completed. Accordingly, the first officer placed handcuffs on defendant and completed the search. The police found no other objects on defendant. After examining the clip, the second officer determined that it contained bullets.

The second officer asked defendant to reveal the location of the gun that was associated with the ammunition clip. Defendant replied that it would be found under his car's front seat. The officer then retrieved a 9mm semi-automatic handgun from that

location. The gun was loaded with an ammunition clip and a bullet inside its chamber. Thus, in addition to the gun, the officers found two ammunition clips, one in defendant's pocket and the other in the gun itself.

The officers transported defendant to police headquarters and subsequently learned that the NCIC report was in error. The gun later was identified as the weapon used in a robbery and murder that had occurred at a gas station earlier on April 8, 1998, in Pequannock, Morris County. The police informed defendant of his rights as required under *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966). After waiving those rights, defendant incriminated himself in a taped statement. Fingerprints found at the gas station and other evidence also connected defendant to the crimes.

A grand jury indicted defendant for purposeful or knowing murder, *N.J.S.A.* 2C:11–3a(1) or (2); armed robbery, *N.J.S.A.* 2C:15–1a (two counts); possession of a weapon for an unlawful purpose, *N.J.S.A.* 2C:39–4a; and felony murder, *N.J.S.A.* 2C:11–3a(3). The case proceeded as a capital case. After the trial court denied defendant's motion to suppress the gun, ammunition, and his statements to the police, defendant pleaded guilty to all charges. Because the penalty-phase jury could not reach a unanimous decision, a non-death verdict was entered. After merging the weapons and felony murder offenses into the murder offense, the trial court sentenced defendant to consecutive terms in respect of the murder conviction and one of the armed robbery convictions. The court also sentenced defendant to a concurrent term in connection with the other robbery conviction. Defendant appealed the denial of his suppression motion as well as the consecutive nature of his sentences.

With one panel member dissenting with regard to the suppression question, the Appellate Division affirmed the trial court, except that the panel directed the trial court to correct the parole ineligibility period associated with the murder conviction. *State v. Diloreto*, 362 *N.J.Super.* 600, 829 *A.2d* 1123 (2003). Defendant

filed an appeal as of right to this Court regarding the suppression issue. *R.* 2:2–1(a)(2). We denied defendant's petition for certification concerning the consecutive sentence question. 178 *N.J.* 252, 837 *A.*2d 1094 (2003).

## II.

"Consistent with the Fourth Amendment to the United States Constitution and Article I, paragraph 7 of the New Jersey Constitution, police officers must obtain a warrant from a neutral judicial officer before searching a person's property, unless the search 'falls within one of the recognized exceptions to the warrant requirement.'" *State v. DeLuca,* 168 *N.J.* 626, 631, 775 *A.*2d 1284 (2001) (quoting *State v. Cooke,* 163 *N.J.* 657, 664, 751 *A.*2d 92 (2000)). When a warrantless search has occurred, "the burden is on the State to prove that its search was permissible." *Id.* at 632, 775 *A.*2d 1284; *accord State v. Wilson,* 178 *N.J.* 7, 14, 833 *A.*2d 1087 (2003).

One form of permissible warrantless conduct is a field inquiry. We have explained:

> A field inquiry "is a limited form of police investigation that, except for impermissible reasons such as race, may be conducted 'without grounds for suspicion.'" *State v. Rodriguez,* 172 *N.J.* 117, 126, 796 *A.*2d 857 (2002) (quoting *State v. Maryland,* 167 *N.J.* 471, 482, 771 *A.*2d 1220 (2001)). As a general rule, "a police officer properly initiates a field inquiry by approaching an individual on the street, or in another public place, and by asking him if he is willing to answer some questions[.]" *Ibid.* (internal citation and quotation marks omitted) (alteration in original). A permissible inquiry occurs when an officer questions a citizen in a conversational manner that is not harassing, overbearing, or accusatory in nature. *Ibid.*

[*State v. Nishina,* 175 *N.J.* 502, 510, 816 *A.*2d 153 (2003).]

The "community caretaker doctrine" provides another basis on which to excuse the warrant requirement. *State v. Cassidy,* 179 *N.J.* 150, 161 n. 4, 843 *A.*2d 1132 (2004). That doctrine applies when the "police are engaged in functions, [which are] totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a [criminal] statute." *Ibid.* (internal quotation marks and citation omitted) (first alteration in

original). "Neither a field inquiry nor community caretaker function requires that the police demonstrate probable cause or an articulable suspicion to believe that evidence of a crime will be found." Kevin G. Byrnes, *New Jersey Arrest, Search and Seizure* § 14:1–1 at 289 (2003). When courts review those forms of citizen-police encounters they "employ a standard of reasonableness to determine the lawfulness of police conduct." *Ibid.*

More specifically, the community caretaker doctrine recognizes that the police often are called on to perform dual roles. One commentator has noted:

> Law enforcement officers generally act pursuant to either law enforcement or community caretaking objectives. The difference between the two stems from the officers' underlying motives. The law enforcement function includes conduct that is designed to detect or solve a specific crime, such as making arrests, interrogating suspects, and searching for evidence. Community caretaking, on the other hand, is based on a service notion that police serve to ensure the safety and welfare of the citizenry at large.
>
> [John F. Decker, *Emergency Circumstances, Police Responses, and Fourth Amendment Restrictions*, 89 *J.Crim. L. & Criminology* 433, 445 (1999).]

Our federal and State constitutions also permit warrantless conduct when the police perceive a risk to their safety. In that circumstance, "an officer is permitted to pat down a citizen's outer clothing when the officer 'has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime.'" *Nishina, supra,* 175 *N.J.* at 514–15, 816 *A.2d* 153 (quoting *Terry v. Ohio,* 392 *U.S.* 1, 27, 88 *S.Ct.* 1868, 1883, 20 *L.Ed.*2d 889, 909 (1968)). "In some cases the facts that permit the officer to order the passenger to alight [his or her car], with nothing more, may justify both the order to get out of the vehicle and the pat-down." *State v. Smith,* 134 *N.J.* 599, 620, 637 *A.2d* 158 (1994).

More particularly, to justify a pat-down search or "frisk" of an individual, an "officer need not be absolutely certain that the individual is armed[.]" *Terry, supra,* 392 *U.S.* at 27, 88 *S.Ct.* at 1883, 20 *L.Ed.*2d at 909. Rather, the test under *Terry* "is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."

*Ibid.* Similarly, an investigatory detention, also known as a *Terry* stop, occurs when the police temporarily detain a person based on a reasonable suspicion of criminal activity. *Nishina, supra,* 175 *N.J.* at 510–11, 816 *A.*2d 153 (explaining escalating standards governing field inquires and *Terry* stops). In that respect, a typical *Terry* encounter must pass muster under a more stringent test than the general reasonableness required to sustain a field inquiry or community caretaker action.

### III.

With the above tenets in mind, this case requires us to evaluate the officers' conduct within the context of unfolding events that led to the seizure of the ammunition clip found in defendant's pocket and the gun found in his automobile. We start with the initial event, namely, the first officer's arrival on the scene. There is no serious question regarding the appropriateness of the officer's driving his police vehicle into the hotel parking lot and retrieving data from the MDT. *See State v. Segars,* 172 *N.J.* 481, 491–93, 799 *A.*2d 541 (2002) (discussing permissibility of MDT lookups). The officer's conduct was proper, and that aspect of this case requires no further analysis.

Defendant's challenge focuses not on his initial contact with the police but on subsequent events. He contends that the police unlawfully ordered him out of his vehicle and patted him down, and otherwise improperly detained him, all without the requisite suspicion mandated by *Terry.* Defendant also argues that the police impermissibly asked him to reveal the location of the gun without administering *Miranda* warnings. In response, the State contends that the police acted under the umbrella of the community caretaker doctrine, requiring no particularized suspicion of criminal conduct. The State also argues that the escalating levels of intrusiveness were objectively reasonable given the NCIC alert and the other factors confronting the officers.

We agree with the State. Because the officers received the NCIC alert *before* posing their initial questions to defendant,

their caretaker role began at the earliest point of personal contact with defendant. The encounter's early phase also can be viewed as a permissible field inquiry. To a certain extent the conceptual framework of a field inquiry and the caretaker doctrine "overlap." Byrnes, *supra*, § 14:1–1 at 289. The concepts differ, however, in that the caretaker doctrine permits the police to exceed a field inquiry's level of intrusiveness, provided that their action is unconnected to a criminal investigation and objectively reasonable under the totality of circumstances.

■ From that vantage point, the officers' decision to place defendant in the police vehicle while they awaited confirmation of the missing person's report, and to pat him down before doing so, was a proper caretaker response to the information confronting them. First, the officers found defendant's car parked at an odd angle. Second, the first officer observed exhaust fumes emanating from the car and saw that its windows were fogged, obstructing his view of the car's interior. Third, that same officer observed that the car's engine had been turned off (suggesting, according to the State, that the car's occupant was not actually asleep). Fourth, the police knew that attempted suicides had occurred in the area where the car was found.

In addition to those factors, there is the fifth and most important factor that the officers believed defendant to be an endangered missing person contained in an NCIC alert. That understanding, considered in concert with the other four factors, is consistent with a reasonable belief that defendant was a person at risk, prompting the officers' caretaker role. Although defendant's contrary arguments are legitimate, we are not persuaded by them. Writing for the court below, Judge Stern reached the same conclusion, offering the following observations, with which we concur:

> We recognize that the issues before us pose difficult questions and that their resolution is debatable, particularly in a State in which we have afforded greater protection to criminal defendants under the State Constitution, *N.J. Const.* art. I, [¶] 7, than the Fourth Amendment to the Federal Constitution. But it is not for us to select the preferable practice of conducting a "missing person" investigation or

to conclude what the police should have done once the "missing person" "hit" was received. The issue is only whether the police officers acted reasonably in the circumstances they faced, and we cannot conclude that the officers were unreasonable in asking a suspected "endangered missing person" to exit his vehicle and wait in the patrol car while they ascertained the basis for the report. Nor were the police unreasonable in patting down the reportedly "endangered missing person" before they put him in their vehicle until they learned why he was reported missing and the facts relating to the report which could inform them if he might be a danger to himself or others.

[*Diloreto, supra,* 362 *N.J.Super.* at 617–18, 829 *A.2d* 1123 (internal citations omitted).]

We need not, and do not, decide whether the circumstances would have justified directing defendant out of his car and subjecting him to a pat-down search absent the overlay of the community caretaker doctrine. In other words, this would be a different case if defendant's name had not been contained in the NCIC alert and we were left to rely solely on the line of *Terry* cases cited by defendant in his brief. But it is precisely because of the NCIC report, within the context of the other factors identified above, that the officers were not required blithely to accept defendant's responses to their initial questions while they awaited confirmation of the missing person's report.

By the same token, we are not persuaded by defendant's contention that the police lacked justification to direct defendant out of the automobile once he had answered their preliminary questions. That contention would have merit if the police had not been given the NCIC alert. In the face of that alert, however, it would have been reasonable for the officers to believe that defendant was suicidal or in some other danger that required police intervention. Simply put, those beliefs would have been consistent with defendant's status as an endangered missing person. Removing defendant from his car (where he then could be seen unobstructed by the fogged windows), and getting him out of the rain, away from a presumably busy highway, and into the safety of a police vehicle, did not exceed the boundaries of the officers' caretaker role.

Our disposition is not altered by the fact that the officers relied on an erroneous NCIC alert. In respect of criminal investigations, we do not recognize an exception to the exclusionary rule based on an officer's good-faith reliance on an improperly issued warrant. *State v. Novembrino,* 105 *N.J.* 95, 157–58, 519 A.2d 820 (1987). Here, however, the error in failing to remove defendant's name from the NCIC database occurred not within the framework of an intended prosecution, but under the protective rubric of the community caretaker doctrine. Thus, under the unique circumstances of this case, *Novembrino* does not control the analysis.

Importantly, we are convinced that the officers did not perform the community caretaker function as a pretext for a criminal investigation. The officers' testimony, relied on by the trial court and undisputed in the record, describes how the police acted out of concern for defendant's safety as they sought to place him securely in the police vehicle. (The officers acknowledged that they took steps to protect their safety as well. The police need not abandon their own safety when reasonably engaged in a caretaker activity.) As stated by the second officer, he and his colleague "determined that it would be best to have the driver exit his vehicle and be brought back to the patrol vehicle until the situation could be sorted out." The first officer revealed the same intention, indicating that the verification of defendant's missing person's report was not undertaken as part of a criminal investigation but "simply [as] a welfare check[.]"

We are satisfied that the officers' determination reflected the essence of the community caretaker function, revealing no motive other than an honest desire to verify defendant's status as a missing person. With reasonableness as the polestar, the State's proofs at the suppression hearing more than adequately supported its position that the officers did not impermissibly cross the line from caretakers to investigators when they discovered the loaded ammunition clip in the process of securing defendant in the police

vehicle. Although the caretaker doctrine is not limitless, it provides sufficient leeway to the police to act as they have done here.

It bears repeating that the most significant factor in our analysis (and a factor that should serve to narrow the reach of our holding) is that the police in this case were responding to an alert regarding an endangered missing person. The critical nature of that activity is reflected in the Legislature's enactment of a set of statutes to enable State and local law enforcement agencies to centralize and coordinate their efforts in searching for missing persons, including children. *See N.J.S.A.* 52:17B–9.6 to–9.17. In that regard, we note that one legal writer has observed that a search for a missing person is part of the core set of caretaker activities:

> In the community caretaking context [ ] the task of identifying community caretaking needs that exist separate and apart from any interest in law enforcement is not as complicated as in other practices. There is a core set of community caretaking activities that have a longstanding tradition and that have achieved relatively unquestioned acceptance in local communities. Thus, *the responsibility of police officers to search for missing persons,* to mediate disputes, and to aid the ill or injured has never been the subject of serious debate; nor has [the] responsibility of police to provide services in an emergency [been subject to such debate]. There is substantial consensus that these duties are part of the police role. And performing these duties obviously serves important ends distinct from any interest in law enforcement.
>
> [Debra Livingston, *Police, Community Caretaking, and the Fourth Amendment,* 1998 *U. Chi. Legal F.* 261, 302 (1998) (emphasis added).]

That brings us to the last sequence of events, namely, the officers' inquiry of defendant regarding the whereabouts of the gun and the resulting search of defendant's car. In upholding that conduct, we again essentially echo the Appellate Division's analysis:

> Once the ammunition clip was found, the subsequent police conduct was warranted. *See State v. Wilson,* 362 *N.J.Super.* 319, 331, 827 *A.2d* 1143, 1150 (App.Div. 2003), in which we held that, while, in New Jersey, exigent circumstances as well as probable cause are necessary to search a vehicle, [*Cooke, supra,* 163 *N.J.* at 670–71, 751 *A.2d* at 99], knowledge that a gun is missing provides exigent circumstances to search a vehicle despite the arrest of the occupant. As in *Wilson,* here, the warrantless entry of the vehicle was justified to search for the gun in the automobile, based on the finding of the loaded ammunition clip because the gun could provide a danger even before a warrant could be secured. As Judge Collester wrote in *Wilson, supra,* 362 *N.J.Super.* at 333, 827 *A.2d* at 1152, there

was a "real danger ... that an automatic handgun could fall into malevolent, untrained or immature hands."

> Nor is suppression of the gun required because the police asked defendant where the gun was located. Particularly in these circumstances in which defendant had not been arrested for a crime, the limited inquiry could be made in the interests of public safety. *State v. Stephenson,* [350 *N.J.Super.* 517, 525], 796 *A.*2d [274] at 279 [ (App.Div.2002) ] (citing *New York v. Quarles,* 467 *U.S.* 649, 659, n. 8, 104 *S.Ct.* 2626, 2633, n. 8, 81 *L.Ed.*2d 550, 559, n. 8 (1984))[.]
>
> [*Diloreto, supra,* 362 *N.J.Super.* at 627–28, 829 *A.*2d 1123 (second alteration in original).]

In addition to harboring safety concerns as caretakers, the police lawfully accumulated information to meet the probable cause and exigency standards before searching defendant's car. *See Cooke, supra,* 163 *N.J.* at 670–71, 751 *A.*2d 92 (outlining test for automobile exception to warrant requirement). That circumstance does not defeat the fact that their conduct at the encounter's outset was totally divorced from a criminal investigatory role in satisfaction of the community caretaker doctrine. Stated differently, the conditions that provided both probable cause and exigency to search defendant's car did not materialize until well after the community caretaker activity was underway. From that perspective, we are satisfied that, although the automobile search passes muster primarily as a public-safety measure, it also was consistent with the traditional notions of probable cause and exigency.

 We, therefore, hold that the police acted within the boundaries of our federal and State constitutions throughout the chronology of events. We hasten to add this cautionary note. The State should not construe our holding as approving wide application of the community caretaker doctrine in this setting. Rather, as suggested earlier, our disposition is the result of the facts before us, most particularly the NCIC missing person's report and the other four factors discussed above. For the reasons already expressed, those five factors triggered the officers' caretaker role and justified their conduct. The community caretaker doctrine remains a narrow exception to the warrant requirement. Consistent with that view, all future cases decided under that doctrine will turn strictly on their individual facts and will be subject, as always, to meticulous judicial review.

## IV.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice PORITZ and Justices LONG, VERNIERO, LaVECCHIA, ZAZZALI, ALBIN and WALLACE—7.

*Opposed*—None.