894 A.2d 659

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v.
BORIS BORETSKY, DEFENDANT–RESPONDENT.

Argued October 11, 2005—Decided April 5, 2006.

*Simon Louis Rosenbach,* Assistant Prosecutor, argued the cause for appellant (*Bruce J. Kaplan,* Middlesex County Prosecutor, attorney).

*Joseph J. Benedict* argued the cause for respondent (*Benedict and Altman,* attorneys; *Mr. Benedict* and *Philip Nettl,* on the briefs).

Justice LaVECCHIA delivered the opinion of the Court.

Defendant Boris Boretsky was charged with capital murder in the death of his estranged wife, Saoule Moukhametova. During jury selection prior to defendant's trial, we granted leave to appeal to review a pre-trial order suppressing some of defendant's statements made to police officers responding to defendant's 9-1-1 telephone call for assistance. *State v. Boretsky,* 185 *N.J.* 250, 883 *A.2d* 1052 (2005). Defendant's statements were made to the officers immediately before, and also after, his arrest at the victim's home. After hearing oral argument, we issued an order reversing the order of suppression in light of the imminent start of trial. This opinion supplements our order.

## I.

Shortly before midnight on March 3, 2002, Officer John Penney of the South Brunswick Township Police Department was dispatched to Moukhametova's residence. He was responding to a 9-1-1 telephone call in which the caller reported that Moukhametova had attempted suicide. The 9-1-1 call was placed from Moukhametova's home by defendant, her estranged husband. The couple was known to the South Brunswick police. Approximately six weeks earlier, South Brunswick officers had responded to a domestic violence incident at the home. As a result of that incident, Moukhametova obtained a temporary restraining order (TRO), and later a final restraining order (FRO), against defendant before the events of March 3. The 9-1-1 dispatcher informed Officer Penney about the FRO when sending him on the assignment.

Upon arriving at Moukhametova's home, Penney observed defendant pacing by the living room window talking on a portable phone. Before seeking entry, Penney confirmed that the 9-1-1 dispatcher was not on the line with defendant. After Penney knocked on the door, defendant answered with the telephone in hand. Defendant attempted to hand the instrument to Penney, saying "can you speak to my attorney?" Penney responded that

he was there for a first-aid call and asked where defendant's wife was. Defendant allowed Penney into the house and directed him to the living room where Penney observed Moukhametova's motionless body lying on a couch. It was obvious that she had a chest injury. On a coffee table nearby lay a kitchen knife with blood on it. Penney called for first aid assistance and then asked defendant when he had heard last from his wife. Defendant's response—that he had seen her or talked to her around 4:00 p.m.—is the first statement that the motion court suppressed. Defendant again tried to hand the portable telephone to Penney, repeating "can you please talk to my attorney?" Penney did not take the phone. Instead he attended to Moukhametova and told defendant to stop moving around.

Defendant was standing and watching Penney when Officer Reeves and then Officer LaPoint entered the living room. At Reeves' direction, defendant sat down on the living room floor. As the officers continued to attend to Moukhametova, defendant persisted in holding and waving the telephone, saying "talk to my lawyer" or "my lawyer is on the phone." The officers ignored defendant's disruptions until, at some point, they took the phone and threw it onto a sofa beyond defendant's reach; the bloodied knife, however, remained unsecured on the table nearby. Officer LaPoint drew his gun, pointed it at defendant, and ordered him to lie face down on the floor. Defendant was placed under arrest for violating the FRO and was administered *Miranda* warnings.[1] While defendant was being led outside to a waiting patrol car, he asked how his wife was doing. The officer responded that he did not know. The officer then asked defendant "how long did you wait to call the police?" Defendant's response—that he waited forty-five minutes to call 9-1-1 after his wife was stabbed—is the second statement suppressed by the motion court.

Additional officers arrived at Moukhametova's home that evening. One officer approached defendant as he was being placed

---

[1] *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

into the patrol car and observed apparent blood stains on defendant's clothing. The officer directed that defendant's clothes be secured in bags. Hearing that, defendant blurted out "I tried to help." A short time later, while defendant was in the back of the patrol car, he asked one of the officers whether his wife was "okay." The officer did not respond.

While being processed at police headquarters, defendant repeatedly asked about his wife's condition. The processing officer responded that he did not know. Defendant began to complain of chest pains and, while he clutched his chest, blurted out "I'm sorry." Defendant was taken by ambulance to a hospital where he was treated for his complaints. After defendant received medical attention, several detectives decided to question him. Defendant was advised again of his *Miranda* rights and acknowledged his understanding of those rights. He agreed to questioning, during which he again repeatedly asked about his wife's condition. Defendant's statement made in response to police questioning at the hospital the morning of March 4, 2002 was suppressed later by the motion court.

In May of 2002, defendant was indicted and charged with the murder of Moukhametova, in violation of *N.J.S.A.* 2C:11–3(a)(1), (2). He also was charged with aggravated assault, *N.J.S.A.* 2C:12–1(b); terroristic threats, *N.J.S.A.* 2C:12–3(a); contempt, *N.J.S.A.* 2C:29–9(b); burglary, *N.J.S.A.* 2C:18–2; possession of a weapon with the purpose to use it unlawfully, *N.J.S.A.* 2C:39–4(d); and tampering with evidence, *N.J.S.A.* 2C:28–6(1).

Defendant moved to suppress all statements that he made to the police on March 3 and 4, 2002. The motion court found that defendant invoked his right to counsel by repeatedly asking the responding officers to speak to his attorney on the telephone. The court also found that defendant was effectively in custody during that period. Accordingly, the court suppressed the statements defendant made in response to police questioning, but not those that he made spontaneously. As a result, defendant's repeated questions about how his wife was doing were not suppressed. Nor did the court suppress defendant's statement "I'm

sorry," made at the police station, or his statement "I tried to help," made outside the house as he was being placed into the patrol car.

The State sought and was granted leave to appeal to the Appellate Division. The Appellate Division affirmed the trial court in an unpublished per curiam opinion. As noted, we granted the State's motion for leave to appeal, *State v. Boretsky, supra,* 185 *N.J.* 250, 883 *A.*2d 1052, and thereafter issued an order on October 20, 2005, reversing the order of suppression.[2]

## II.

Defendant has argued throughout this matter that his repeated requests to the officers to "talk to my lawyer," while holding a telephone or waving it in their direction, were sufficient to invoke his right to counsel and thereby to protect his right against self-incrimination. He claims that his invocation was unambiguous or, at the very least, sufficient to trigger a police duty to clarify his request before commencing interrogation, citing *State v. Chew,* 150 *N.J.* 30, 63, 695 *A.*2d 1301 (1997) (stating that "equivocal" requests for counsel must "be interpreted in a light most favorable to the defendant."). Accordingly, in defendant's view, it was a violation of his rights for the officers to have asked him when he last spoke to or heard from his wife and, moreover, the subsequent administration of *Miranda* warnings could not cure the violation. For that reason, defendant contends that his answer to the question asked of him after he inquired about his wife's condition must be suppressed as well as his statement given at the hospital on March 4, 2002.

The State contends that *Miranda* warnings are designed to protect the right against self-incrimination of a suspect facing a custodial interrogation. Here the police officers were responding in an emergency aid capacity. Their initial interaction with defendant was incidental to their efforts to aid a victim in an emergen-

---

[2] After that order issued, defendant was tried, convicted and sentenced for the murder of his estranged wife.

cy. Thus, according to the State, defendant's claim that he asserted his right to counsel has no relevance here. Defendant was not facing custodial interrogation and was not entitled to *Miranda's* protections during the initial police response to the 9–1–1 emergency call. When defendant was placed under arrest, he received his *Miranda* warnings and he elected to initiate conversation with the officers present and to respond to later questioning.

Our resolution of those conflicting claims requires that we turn first to the purposes behind the right against self-incrimination.

### III.

The right against self-incrimination has an extensive common law history. *See* R. Carter Pitman, *The Colonial and Constitutional History of the Privilege Against Self–Incrimination in America*, 21 *Va. L. Rev.* 763 (1963) (providing historical discussion of common law privilege). Both English and early American case law discussing the roots of the privilege emphasize the untrustworthiness of confessions obtained by means of custodial coercion and suggest that the desire to end such practices was its primary justification.[3] The United States Supreme Court has specifically identified that goal as critical in the development of the modern Fifth Amendment right against self-incrimination. *See Murphy v. Waterfront Comm'n*, 378 *U.S.* 52, 55–57, 84 *S.Ct.* 1594, 1596–98, 12 *L.Ed.*2d 678, 681–83 (1964).

Indeed, the desire to protect the right against self-incrimination motivated the Supreme Court to craft the constitutional protections imposed by *Miranda v. Arizona*, 384 *U.S.* 436, 457–58, 86

---

[3] *See, e.g., King v. Rudd,* 168 *Eng. Rep.* 160, 161, 164 (K.B. 1783) (Lord Mansfield, C.J.) (stating that English courts excluded confessions obtained by threats and promises); *King v. Warickshall,* 168 *Eng. Rep.* 234, 235 (K.B. 1783) ("A free and voluntary confession is deserving of the highest credit, because it is presumed to flow from the strongest sense of guilt ... but a confession forced from the mind by the flattery of hope, or by the torture of fear, comes in so questionable a shape ... that no credit ought to be given to it; and therefore it is rejected."); *Hopt v. Territory of Utah,* 110 *U.S.* 574, 4 *S.Ct.* 202, 28 *L.Ed.* 262 (1884) (expressing same).

*S.Ct.* 1602, 1618–19, 16 *L.Ed.*2d 694, 713–14 (1966).[4] The Court explicitly stated that it was concerned about the relationship between custodial interrogation—with its "inherently compelling pressures"—and the effect that the resulting atmosphere of intimidation has on a suspect's free will. *Id.* at 456–57, 467, 86 *S.Ct.* at 1618–19, 1624, 16 *L.Ed.*2d at 712–14, 719. The purpose of the *Miranda* warnings, enforced through the suppression remedy, then, "is not to mold police conduct for its own sake," but "to dissipate the compulsion inherent in custodial interrogation." *Moran v. Burbine*, 475 *U.S.* 412, 424–25, 106 *S.Ct.* 1135, 1142–43, 89 *L.Ed.*2d 410, 422–24 (1986).

The Supreme Court has advised against extending *Miranda* unless the holding "is in harmony with *Miranda's* underlying principles." *Fare v. Michael C.*, 442 *U.S.* 707, 717, 99 *S.Ct.* 2560, 2568, 61 *L.Ed.*2d 197, 207 (1979). *See also Duckworth v. Eagan*, 492 *U.S.* 195, 210, 109 *S.Ct.* 2875, 2884, 106 *L.Ed.*2d 166, 183 (1989) (O'Connor, J., concurring) (noting inappropriateness of "extend[ing] the *Miranda* rule and the suppression remedy attached to it to situations where its deterrent effect is minimal and is outweighed by other compelling interests."). Thus, harkening back to *Miranda's* underlying principles, the Court repeatedly has not extended *Miranda* when extension was not "justified by its necessity for the protection of the actual right against compelled self-incrimination." *United States v. Patane*, 542 *U.S.* 630, 639, 124 *S.Ct.* 2620, 2627, 159 *L.Ed.*2d 667, 676 (2004); *see also Chavez v. Martinez*, 538 *U.S.* 760, 778, 123 *S.Ct.* 1994, 2007, 155 *L.Ed.*2d 984, 1001 (2003) (Souter, J., concurring) (requiring a "powerful showing" before "expand[ing] ... the privilege against compelled self-incrimination"). For example, *Miranda* was not extended to interviews with probation officers because the defendant was not deemed to be in custody. *Minnesota v. Murphy*, 465 *U.S.* 420,

---

4 See *Dickerson v. United States*, 530 *U.S.* 428, 441, 120 *S.Ct.* 2326, 2335, 147 *L.Ed.*2d 405, 418 (2000) (reinforcing constitutional underpinning to rule announced in *Miranda* decision, notwithstanding that exceptions to warning requirement have been recognized over time).

429–33, 104 *S.Ct.* 1136, 79 *L.Ed.*2d 409 (1984). *See also Beckwith v. United States,* 425 *U.S.* 341, 347–48, 96 *S.Ct.* 1612, 1616–17, 48 *L.Ed.*2d 1, 8 (1976) (refusing to extend *Miranda* requirements to non-custodial questioning by Internal Revenue Service agents).

More specifically, *New York v. Quarles,* 467 *U.S.* 649, 104 *S.Ct.* 2626, 81 *L.Ed.*2d 550 (1984), speaks to the issue in the present matter. In *Quarles,* the police pursued the defendant into a supermarket after a woman identified him as the man who raped her. After an officer discovered that the defendant was wearing an empty gun holster, the officer asked where the gun was. The defendant gave a self-incriminating response that led to discovery of physical evidence (the gun), without having been administered his *Miranda* warnings. The Supreme Court concluded "that the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the ... privilege against self incrimination." *Quarles, supra,* 467 *U.S.* at 657, 104 *S.Ct.* at 2632, 81 *L.Ed.*2d at 558; *see also Patane, supra,* 542 *U.S.* at 643–44, 124 *S.Ct.* at 2629–30, 159 *L.Ed.*2d at 679 (holding that physical evidence obtained under similar circumstances is admissible). *Quarles* has served as the impetus for several courts to recognize a public safety exception to *Miranda. See, e.g., United States v. Martinez,* 406 *F.*3d 1160, 1165 (9th Cir.2005) (noting public safety exception to *Miranda* when admitting suspect's answers to questions posed by officer responding to domestic disturbance).

With that exception in mind, we turn to the circumstances herein and defendant's argument that police responding to a 9–1–1 call could not extract information from him about the emergency they were there to address and then use his statements in his later trial.

IV.

A.

■ The uncontroverted testimony at the suppression hearing was that the police were sent to Moukhametova's home in re-

sponse to a 9–1–1 emergency call placed by defendant seeking assistance for his estranged wife. Emergency aid response provided through the 9–1–1 emergency telephone system implemented in New Jersey, *see N.J.S.A.* 52:17C–1 to –16, and *N.J.A.C.* 17:24–1.1 to –11.4, is a recognized police duty. *See State v. Frankel,* 179 *N.J.* 586, 603–07, 847 *A.*2d 561 (2004).[5] Indeed, the importance of the emergency aid function has led to recognition in this State of an emergency aid exception to the constitutional requirement of a warrant. *Id.* at 598–600, 847 *A.*2d 561. We apply a three-part test when determining whether the emergency aid doctrine permits a warrantless search. *See State v. Cassidy,* 179 *N.J.* 150, 161, 843 *A.*2d 1132 (2004). The public official must have an objectively reasonable belief, even if later found to be erroneous, that an emergency demands immediate assistance in order to protect or preserve life, or to prevent serious injury; the provision of assistance must be the prime motive for the public official's warrantless entry; and, any search must be limited to those places that have a nexus to the emergency. *Ibid.* The first two prongs of that test assist in the present analysis.

■ In this matter, the officers appeared at Moukhametova's home to provide emergency aid in response to a report of an attempted suicide (prong one). That motivating purpose shaped the officer's initial interactions with defendant, the only person at the scene who was able to answer questions and could help in the assessment of the needs and status of the victim before medical assistance arrived (prong two). The record indisputably indicates that the provision of emergency assistance to an alleged suicide victim was the officers' paramount goal upon arriving at the residence and their actions bespeak a consistent effort to assist a victim obviously requiring first aid. Consistent therewith was Penney's initial verbal interaction with defendant. Penney asked where defendant's wife was and, a short while later, asked when

---

5 See *State v. Diloreto,* 180 *N.J.* 264, 281, 850 *A.*2d 1226 (2004), discussing the police community caretaking function and the core tasks that are part of that array of responsibilities, including emergency aid to the sick or injured.

defendant had last spoken with the unresponsive victim lying on the couch. The exchanges were incident to the officer's management of the emergency and were part of an objectively reasonable course of action taken by Penney in the face of that emergency.

As noted, the emergency doctrine has been applied to override the normal warrant requirement for searches and seizures. The public safety concerns implicit in the doctrine similarly support the reason for the public safety exception to *Miranda*. *See Quarles, supra*, 467 *U.S.* at 657–58, 104 *S.Ct.* at 2632, 81 *L.Ed.*2d at 558–59; *see also United States v. Martinez*, 406 *F.*3d 1160, 1165 (9th Cir.2005) (applying public safety exception to *Miranda*). When public officials question an individual at the site of an emergency in which life or personal safety hangs in the balance and obtain a responsive statement that may be indicative of guilt, that consequence is secondary to the need to protect public safety. *Martinez, supra*, 406 *F.*3d at 1165–66. Further, in the emergency aid context, coerced confessions secured through abusive custodial interrogation are not likely. *See Howard v. Garvin*, 844 *F.Supp.* 173, 174–75 (S.D.N.Y.1994)(holding that *Miranda* warnings not required prior to crime scene questioning of suspect involved in ongoing hostage situation when public safety was prime objective of questions, explaining that "[n]either the Fifth Amendment privilege nor the underlying objectives of *Miranda* were violated.").

Here also, the emergency-response activity unfolding in Moukhametova's home bore no resemblance to a coercive custodial interrogation of the sort that concerned the common law and later led to the constitutional right against self-incrimination and, ultimately, the *Miranda* remedy. The police purpose in coming to the scene was to provide emergency aid. The officers were the community's first responders and were required to give the victim their primary attention. When acting in furtherance of that duty the police officers must be able to assess the needs of the victim, including asking defendant about his last interaction with his

unresponsive wife. Simply put, the duty to provide aid is paramount.

The fact that a FRO was in place and that defendant's presence at the home was in violation of that order does not alter our conclusion. It makes no difference whether defendant was in custody. The officers must be permitted to interact with defendant in performing their emergency aid responsibilities. The initial question Penney asked was not aimed at eliciting incriminating information from defendant, but rather, to obtain information about the victim to help in the assessment of her condition. We have recognized that at times the police act in a dual capacity when carrying out expected caretaker roles. *See Diloreto, supra,* 180 *N.J.* at 276, 850 *A.*2d 1226. Thus, even if we assume that defendant did not believe that the officers would allow him to leave because of the FRO violation, the result would be the same. In those circumstances, we nevertheless would conclude that this was not the kind of custodial interrogation setting that triggers *Miranda.* The questions posed to defendant, while the condition of his clearly severely injured wife was being assessed, fall wide of that mark.

In sum, the police officers' emergency aid response trumps application of *Miranda* and its protection of defendant's privilege against self-incrimination. In light of that conclusion, it is not necessary for us to resolve what the officers reasonably could or should have made of this defendant's wild waving of a telephone in their direction while he repeated the question "can you talk to my lawyer?" We recognize the ambiguity in defendant's repeated question and that both the trial court and Appellate Division viewed the matter through the prism of that ambiguity. We are not sure whether those courts treated defendant's statements as an exercise of the right to counsel or an ambiguous assertion of a desire for counsel's participation. In either case, the meaning of defendant's repeated questions does not alter the analysis. Because we conclude that the emergency aid doctrine overrides the

need to give *Miranda* warnings, the protections of *Miranda* simply are not triggered.

We find that the police officers sought information from defendant in carrying out their emergency aid functions and that in that setting, he cannot claim a violation of his right against self-incrimination. *See New York v. Quarles*, 467 *U.S.* 649, 104 *S.Ct.* 2626, 81 *L.Ed.*2d 550 (1984). Extension of the *Miranda* rule in this case is not "justified by its necessity for the protection of the actual right against compelled self-incrimination." *United States v. Patane*, 542 *U.S.* 630, 639, 124 *S.Ct.* 2620, 2627, 159 *L.Ed.*2d 667, 676 (2004) (citing *Chavez v. Martinez*, 538 *U.S.* 760, 778, 123 *S.Ct.* 1994, 155 *L.Ed.*2d 984 (2003)).[6] *See also Moran v. Burbine*, 475 *U.S.* 412, 425, 106 *S.Ct.* 1135, 1142–43, 89 *L.Ed.*2d 410, 422–24 (1986) (concluding that *Miranda* rule should not apply where it "might add marginally to *Miranda's* goal of dispelling the compulsion inherent in custodial interrogation" and is outweighed by overriding concerns).

## B.

■ When later defendant was placed under arrest, he was given *Miranda* warnings. If defendant's earlier request for the police to speak to his attorney on the telephone was intended to be an exercise of the right to counsel, the *Miranda* warnings should have alerted him to say he was represented by counsel. Defendant did not so indicate. It was therefore permissible, after he initiated conversation by asking about his wife's condition, for the officer to ask defendant how long he had waited before calling 9–1–1.

---

6 There is a compelling interest in establishing a workable rule "to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests in the specific circumstances they confront." *Dunaway v. New York*, 442 *U.S.* 200, 213–14, 99 *S.Ct.* 2248, 2257, 60 *L.Ed.*2d 824, 836 (1979); *see also Quarles, supra*, 467 *U.S.* at 658, 104 *S.Ct.* at 2633, 81 *L.Ed.*2d at 559.

To the extent that defendant's argument relies on our decision in *Chew, supra,* that reliance is misplaced. We reject the proposition that an individual's equivocal statement about "counsel," made during an emergency aid situation while in police presence and before *Miranda* warnings are administered, constitutes the invocation of the *Miranda* right to counsel. Just as the anticipatory invocation of that right to counsel is ineffective outside of the custodial interrogation setting, *McNeil v. Wisconsin,* 501 *U.S.* 171, 182 n. 3, 111 *S.Ct.* 2204, 2211, 115 *L.Ed.*2d 158, 171 (1991), an ambiguous invocation of that right is ineffective in an emergency aid setting.

For defendant Boretsky, during the emergency aid assistance period his ambiguous repeated request of the responding officers to talk to his attorney did not trigger *Miranda's* protections. When the officers' attention turned to defendant and he was placed under arrest, he properly was given *Miranda* warnings. He did not assert thereafter his right to counsel. Thus, his decision to initiate conversation left him open to a follow-up question, and later at the hospital he agreed to questioning after being given, again, *Miranda* warnings. Those statements should not have been suppressed.

To the extent that our decision in *Chew* suggests a different result, today's holding is controlling. An individual's intentions in respect of equivocal statements about "counsel" during an emergency aid situation are not relevant for *Miranda* purposes. During the emergency aid response, an alleged "equivocal" reference to counsel lacks sufficient basis to tie the statement to interests the *Miranda* remedy was designed to protect. When the emergency ends and *Miranda* warnings are administered, we hold that the administration of the warning satisfies *Miranda.*

## V.

The judgment of the Appellate Division, which affirmed the order of suppression, is reversed.

*For reversal*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA-SOTO—7.

*Opposed*—None.