919 A.2d 130

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v.
MICHAEL TUCKER, DEFENDANT–RESPONDENT.

Argued November 14, 2006—Decided April 17, 2007.

*Simon Louis Rosenbach,* Assistant Prosecutor, argued the cause for appellant (*Bruce J. Kaplan,* Middlesex County Prosecutor, attorney).

*Alison S. Perrone,* Designated Counsel, argued the cause for respondent (*Yvonne Smith Segars,* Public Defender, attorney).

JUSTICE WALLACE, JR., delivered the opinion of the Court.

Following the tragic death of his mother, defendant gave several statements to the police. In his initial statement, defendant did not include relevant information that he revealed in subsequent

statements or that the police later discovered. At trial, defendant's several statements were admitted into evidence, and the prosecutor was allowed to comment on the discrepancies in those statements. On appeal, the Appellate Division reversed, concluding that those comments were prohibited uses of defendant's right to remain silent. We disagree. We hold that the prosecutor's comments on the differences in defendant's post-*Miranda*[1] statements are not violations of the proscription against the use of defendant's silence " 'at or near' the time of arrest, during official interrogation, or while in police custody." *State v. Muhammad,* 182 *N.J.* 551, 569, 868 *A.*2d 302 (2005) (citations omitted).

## I.

On June 11, 2000, defendant, Michael Tucker, called 9–1–1 and reported that he had returned home to discover his mother's dead body. The Piscataway police responded to the home and found the lifeless body of Mary Tucker. Patrolman James Richards inspected the house and found no evidence of a struggle or forced entry.

Richards questioned both defendant and his girlfriend, Tracy Stepney, who also was present. Defendant stated that he last saw his mother two days earlier on Friday, June 9, 2000. Defendant drove his mother home from the grocery store and then left to spend the weekend with Stepney in Plainfield. On Saturday, he and Stepney went to New York City for the day. On Sunday afternoon, they returned to his mother's home and found her lifeless body. Defendant claimed he also found the back door unlocked. In a separate interview, Stepney provided a similar account, also mentioning that the back door was unlocked.

The police transported defendant to police headquarters where they administered *Miranda* warnings. At some point, the police arrested defendant on unrelated outstanding warrants. The rec-

---

[1] *Miranda v. Arizona,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

ord does not reveal whether he was arrested before or after he was given *Miranda* warnings and agreed to speak to the police. However, he reiterated that he last saw his mother on Friday following their trip to the grocery store. Defendant did not mention that he had taken his mother to the bank in either of his statements.

Meanwhile, the police investigation revealed the victim's purse in a bedroom closet containing $747 in cash and a checkbook with the last entry made out to cash in the amount of $3000. The police learned that the victim cashed a check at the United National Bank in Plainfield on Friday, June 9, and that she received thirty $100 bills.

In a second interview of defendant at police headquarters, the police again informed defendant of his *Miranda* rights and interviewed him. On that occasion, defendant acknowledged that he had taken his mother to the bank, but claimed that he waited for her in the car. Defendant explained that the $520 in his pocket was money he earned repairing cars. He displayed five $100 bills and one $20 bill.

The police later obtained a bank surveillance tape that showed the victim entering the bank at approximately 9:25 a.m. on June 9, 2000. The tape also revealed that defendant was present and stood behind his mother as she spoke to the bank teller. He wore denim shorts that the police later discovered in Stepney's apartment. Blood tests conducted on stains found on the shorts revealed that some of the blood was the victim's, some was defendant's, and some was of an unknown third person.

On November 29, 2000, the police charged defendant with purposeful or knowing murder, felony murder, armed robbery, and possession of a weapon with the purpose to use it unlawfully against another person. At trial, the State offered into evidence defendant's several statements and presented evidence that the last message on the victim's telephone answering machine was from a person seeking to collect a hospital debt owed by defendant in the amount of $1594.

Specifically, in respect of the issues in this appeal, the State emphasized the following in its opening statement:

> You're going [to] hear testimony in this courtroom regarding some things that Michael Tucker said to law enforcement. See, when he spoke to them he said that he took his mother to the Pathmark, and that is true, but he didn't tell anybody that he went to the bank in the beginning. It wasn't until law enforcement found out that he went to the bank that he started telling stories and telling people that he did in fact go to the bank. But there will be more testimony regarding his story about going to the bank. Pay close attention to that and I will revisit that issue in my closing argument.

Later, the prosecutor elicited testimony from Patrolman Richards, Detective Mostowski, and Investigator Janowiak that when defendant was initially questioned at the scene and again at the police station, he said nothing about taking his mother to the bank. During summation, the prosecutor stressed that defendant failed to mention the bank in his first two statements.

Defendant did not testify or present any witnesses. The jury was unable to reach a verdict on the murder charge, but found defendant guilty of the remaining charges. The trial court merged the convictions into the felony murder charge, and sentenced defendant to a life term with thirty years of parole ineligibility.

Defendant appealed. In an unpublished, per curiam opinion, the Appellate Division reversed and remanded for a new trial. The panel ruled that it was error for the trial court to admit evidence that defendant owed a debt to the hospital, but declined to decide whether a new trial should be ordered based on that error alone. The panel also concluded that it was reversible error for the prosecutor to comment that defendant did not tell the police in his first statement that he took his mother to the bank, and in his second statement that he entered the bank with his mother. The panel reasoned that the prosecutor's comments violated our recent decision in *Muhammad, supra,* in which we held that the State may not comment on a defendant's silence "while in custody, under interrogation, or 'at or near' the time of his arrest." 182 *N.J.* at 558, 868 *A.*2d 302. We granted the State's petition for certification. 187 *N.J.* 81, 899 *A.*2d 304 (2006).

## II.

The State argues that when a suspect waives his privilege to remain silent and speaks to the police, disclosing new information in several statements, the gaps in those statements are not protected silence. The State contends that because defendant chose not to be silent, our recent decision in *Muhammad* does not control this case. Furthermore, the State urges that when a suspect is given his *Miranda* rights and elects to give multiple statements, it is not commenting on silence for the State to point out inconsistencies in the statements. The State also cites *State v. Boretsky*, 186 *N.J.* 271, 894 *A.*2d 659 (2006), contending that the interview of defendant after police responded to defendant's 9-1-1 call was outside the scope of defendant's constitutional protections.

In contrast, defendant urges that the prosecutor's use of any differences in his statements violated his state constitutional right against self-incrimination as this Court held in *Muhammad, supra,* because the prosecutor was commenting on his silence "while in custody, during interrogation, or 'at or near' the time of his arrest." 182 *N.J.* at 568, 868 *A.*2d 302. He contends that under established law, facts omitted from a statement are the same as the exercise of the right to remain silent, and therefore, the omissions are not admissible for any purpose. Further, defendant observes that *Boretsky* does not apply here because the police arrived at the scene to investigate the circumstances surrounding the death, not to provide emergency medical assistance, which was the foundation of *Boretsky.*

## III.

Preliminarily, we note that we agree with defendant that this case does not call for the application of the principles articulated in *Boretsky.* In that case, we held that in an emergency situation, it is not a violation of *Miranda* to ask questions "to obtain information about the victim to help in the assessment of her condition," without first giving the defendant *Miranda* warnings. *Boretsky, supra,* 186 *N.J.* at 282, 894 *A.*2d 659. In the

present case, the police were confronted with a tragic non-emergent situation, that is, the need to investigate a murder. Under these circumstances, the exception for emergency medical assistance does not apply.

Defendant contends it was a violation of his right to remain silent for the prosecutor to comment on the differences in his statements. The United States Supreme Court addressed an analogous issue in *Anderson v. Charles,* 447 *U.S.* 404, 100 *S.Ct.* 2180, 65 *L.Ed.*2d 222 (1980). There, the defendant's testimony at trial differed from his earlier statement. *Id.* at 405–06, 100 *S.Ct.* at 2180–81, 65 *L.Ed.*2d at 224–25. The Court held that the prohibition against the use of defendant's silence after *Miranda* warnings are given "does not apply to cross-examination that merely inquires into prior inconsistent statements." *Id.* at 408, 100 *S.Ct.* at 2182, 65 *L.Ed.*2d at 226. The Court reasoned that such cross-examination "makes no unfair use of silence because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all." *Ibid.* The Court recognized that, although "two inconsistent descriptions of events may be said to involve 'silence' insofar as it omits facts included in the other version," it was not prepared to adopt such a "formalistic understanding of 'silence.' " *Id.* at 409, 100 *S.Ct.* at 2182, 65 *L.Ed.*2d at 227.

■ We are in accord with the reasoning in *Anderson.* A defendant's right to remain silent is not violated when the State cross-examines a defendant on the differences between a post-*Miranda* statement and testimony at trial. When a defendant agrees to give a statement, he or she has not remained silent, but has spoken. Thus, we conclude that it is not an infringement of a defendant's right to remain silent for the State to point out differences in the defendant's testimony at trial and his or her statements that were freely given. *See State v. Cabral,* 275 *Conn.* 514, 881 *A.*2d 247, 254–55, *cert. denied,* —— *U.S.* ——, 126 *S.Ct.* 773, 163 *L.Ed.*2d 600 (2005); *MacDonald v. State,* 816 *A.*2d 750,

753–54 (Del.2003); *Lopez v. United States,* 801 *A.*2d 39, 47 n. 16 (D.C.2002); *Trice v. State,* 766 *N.E.*2d 1180, 1183–84 (Ind.2002).

Although the present case does not involve inconsistencies between a statement and defendant's testimony at trial, it does involve inconsistencies in several statements that were freely given and admitted into evidence. We find no meaningful distinction between the two situations that would justify a different result. In both instances, a defendant has waived the right to remain silent and freely spoken.

Balancing the right to remain silent against the State's right to fairly impeach different statements is a delicate task. In *Muhammad, supra,* we struck the balance in favor of the defendant and concluded that "[a] suspect who begins to speak to the police while in custody, during interrogation, or 'at or near' the time of his arrest does not waive his right against self-incrimination when he falls silent—the words he could have spoken cannot be used against him." 182 *N.J.* at 568, 868 *A.*2d 302 (citations omitted). Here, however, defendant did not remain silent, as he had a right to do. Defendant's several statements were admitted into evidence and there is no claim that it was error to do so. Defendant was not obligated to give the subsequent statements that either omitted key aspects of where he had taken his mother or contained assertions that were contradicted by other evidence. The fact is, defendant did not remain silent, but freely related different stories to the police. Under these circumstances, we strike the balance in favor of the State. We conclude that the State's pointing out of inconsistencies in defendant's statements and other evidence at trial did not constitute an unconstitutional comment on silence.

■ We hold that whether the asserted inconsistencies by a defendant are between two or more statements or between a statement and testimony at trial, the State may seek to impeach the validity of those statements. In both instances, the defendant has not remained silent and therefore, any inconsistency may be challenged.

## IV.

■ We have consistently limited the use of such evidence to issues of credibility and not substantive evidence on the issue of defendant's guilt or innocence. *State v. Brown*, 190 *N.J.* 144, 158, 919 *A.*2d 107, 116, 2007 *WL* 1119218 (2007). In the present case, no limiting instruction was given and the jury could have used the evidence substantively to find defendant guilty. Because defendant did not object to the trial court's failure to give a limiting instruction, we address the issue under the plain error standard. *R.* 2:10–2.

Even without the comments of the prosecutor and the testimony of the police officers concerning the discrepancies in defendant's statements, the evidence of the bank surveillance tape that depicted defendant standing behind his mother inside the bank clearly contradicted defendant's statement that he was not in the bank. Whether or not the prosecutor commented on defendant's omissions, the surveillance tape presented strong evidence that impeached portions of defendant's statements. Thus, the credibility of defendant's statements was clearly at issue. Under those circumstances, we are convinced that the failure to give a limiting instruction could not have caused the jury to reach a result it would not have otherwise reached. *R.* 2:10–2.

## V.

The Appellate Division panel also found error in the admission of the evidence that defendant owed a debt and reasoned that "the unemployment testimony naturally buttressed the debt testimony in such a way that the jury could easily draw the impermissible inference that defendant's lack of money and lack of employment led him to commit the crime in question." However, the panel did not determine whether that error, standing alone, would warrant a new trial. Consequently, we remand to the Appellate Division to determine whether the improper admission of the debt evidence by itself requires a new trial.

## VI.

The judgment of the Appellate Division is reversed. We remand to the Appellate Division for further proceedings consistent with this opinion.

*For reversal and remandment*—Chief Justice ZAZZALI and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA-SOTO and HOENS—7.

*Opposed*—None.