# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1518-14T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ANTHONY IRIZARRY a/k/a TONE,

    Defendant-Appellant.

_____

Submitted May 30, 2017 — Decided June 12, 2017

Before Judges Sabatino and Nugent.

On appeal from Superior Court of New Jersey,
Law Division, Passaic County, Indictment No.
12-08-0619.

Joseph E. Krakora, Public Defender, attorney
for appellant (John A. Albright, Designated
Counsel, on the briefs).

Camelia M. Valdes, Passaic County Prosecutor,
attorney for respondent (Robert J. Wisse,
Assistant Prosecutor, of counsel and on the
briefs).

PER CURIAM

This case arises out of an incident in which defendant Anthony Irizarry engaged in sexual activity with an adult woman, P.R.[1] The State's theory at trial was that defendant threatened P.R. at knifepoint, drove her to a desolate location, and forced her to engage in oral and anal sexual acts. Defendant, who testified at trial in his own defense, asserted that P.R. had offered to have sex with him in exchange for drugs, and that their ensuing sexual relations were consensual.

Following a nine-day trial, a jury acquitted defendant of kidnapping, terroristic threats, and various weapons charges. However, the jury found him guilty of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(4), and third-degree aggravated criminal sexual contact, N.J.S.A. 2C:14-2(a)(4). The State voluntarily dismissed an additional count that charged defendant with a "certain persons" weapons offense. After denying defendant's new trial motion, the court sentenced defendant on the first-degree offense to an extended custodial term of thirty-five years, subject to the parole ineligibility period mandated by the No Early Release Act ("NERA"), N.J.S.A. 2C:43-7.2. The sentence was to run consecutively to a sentence defendant was serving on an unrelated conviction.

---

[1] We use initials to protect the privacy of the person the State deemed to be the victim.

On appeal, defendant contends that the trial court improperly and prejudicially allowed the prosecutor to cross-examine him about his failure to divulge his sex-for-drugs explanation of the underlying incident during post-arrest interrogation by the police. Defendant further argues that the jury charge was flawed in omitting an instruction about the defense of consent, and in not alternatively charging second-degree sexual assault and fourth-degree criminal sexual contact as lesser included offenses. Lastly, defendant argues his sentence is manifestly excessive and is the product of an abuse of discretion.

For the reasons that follow, we reverse and remand for a new trial because of the post-arrest silence issue, but reject all of defendant's remaining claims of error.

## I.

As we have noted, the State and defendant presented diametrically conflicting narratives at trial, except insofar as defendant acknowledged that he and P.R. engaged in sexual activity on the date in question. Both defendant and P.R. are adults. Defendant has an associate's degree from a technical school, resided with a long-time girlfriend, and had one child. P.R., who testified through a Spanish interpreter, was a factory worker who rented a room in the City of Passaic.

<u>P.R.'s Version</u>

According to P.R., on May 20, 2011, she left her residence at approximately 5:30 a.m. and began walking to catch a bus to take her to work. She testified that, as she walked down the street, a car stopped behind her. Suddenly a man grabbed her from behind. P.R. was briefly able to break free, but the man caught up with her a block away. She did not scream because the man covered her mouth and told her that if she cried out he would kill her. Although P.R. recalled that other people were nearby, none of them intervened to assist her.

P.R. testified that the man was armed with a knife approximately four inches long. He put her in a black car and drove her to a construction site. She described the area as desolate, although she did see another person walking along a path as the black car arrived.

After they arrived, the man threatened to kill P.R. with the knife unless she performed oral sex on him. She complied. Then he made her take her pants off. He directed her to the car's front seat, where he sexually assaulted her anally. According to P.R., she screamed out and pled with defendant to stop, but he persisted. When he finished, he gave her a glove to wipe off her

anus.  She asked him to drive her home, promising that she would not reveal what had occurred.

They got back in the car, and the man drove P.R. back to Passaic.  Before he released her, he took her cell phone and told her "he had the names of all my relatives and that if I said anything he said he knew people in Passaic that would kill me if I [told anyone]."

The man dropped P.R. off about a half-hour away from her home.  She walked over to a taxi stand, and the cab driver called the police.  When the police arrived, she told them her account, and they attempted to drive her to where the sexual assault took place.  They then took her to the hospital.

The police did not attempt to have P.R. identify her attacker.  At trial, P.R. stated that she did not remember what her attacker looked like, and that she had never seen him before this incident.  The prosecutor did not ask P.R. whether she recognized defendant in the courtroom.

Defendant's Version

Defendant's trial testimony presented a markedly different narrative.  He stated that at about 5:30 a.m. on May 20, 2011, he was selling crack cocaine on Passaic Street near a park.  He said he had been out there for about ten to eleven hours.  A short woman approached him, and defendant testified "she was willing to

exchange a favor for drugs," which meant to him that she was "willing to have sex for drugs." Defendant said he agreed to the proposition.

According to defendant, he and the woman then walked to a nearby alley, where they had anal sex. Defendant said he did not force the woman to do so. He denied having any oral sex with her. Once he ejaculated, defendant pulled his pants up, and turned to leave. The woman asked defendant for drugs, and he told her to leave. He then left and went home. He testified that he never intended on giving the woman drugs. He never saw the woman again.

On cross-examination, defendant testified that he made "$750, $760" that night selling drugs. Additionally, he stated that he does not drive and did not have a vehicle.

The Investigation

The police investigation of the incident was conducted by several officers from the City of Passaic Police Department, including Officer Raymond Rodriguez.

On the day of the incident, Officer Rodriguez took P.R. in his patrol car and drove onto Route 21 to the area where she alleged the incident took place. She could not find the location, but was able to identify a "castle-looking" building where her assailant had dropped her off. The officer then took P.R. to the hospital for a medical examination.

Massiel Delacruz Green, a physician's assistant specializing in O.B./G.Y.N., testified as an expert witness for the State. She is qualified in the field of sexual assault forensic examination. Delacruz Green examined P.R. for about three hours on the day of the incident. During that exam, Delacruz Green interviewed P.R., and collected samples from various parts of her body, including her anus, vagina, and mouth. Delacruz Green noticed "certain oral edema, so around P.R.'s mouth it was swollen." Additionally, Delacruz Green identified "multiple lacerations along the anal folds" and "micro lesions" along the woman's posterior. However, Delacruz Green did not notice any bruises, scratches, or knife-marks on P.R. anywhere on her body, including her anus.

Police Detective Edward Valentin also took part in the investigation. Initially, police attempted to interview P.R., but Valentin testified that she was too shaken up to provide a statement to police. Three days after the incident, Valentin met P.R. again, and she guided Valentin and Officer Rodriguez to the place where she believed the assault had occurred. He testified that P.R. directed them to Route 21, and they got off at a desolate industrial area in Newark.

P.R. directed the police to a construction site. Once there, Valentin testified the police noticed a security camera. After noticing the camera, the police returned P.R. to the Passaic City

A-1518-14T4

Police headquarters. Valentin testified that P.R. told police that her assailant had taken her from her residence at knifepoint, drove her to the industrial area off Route 21, and assaulted her. She told police that she never got a good look at her assailant.

After the interview, Valentin returned to the location and obtained camera footage of the area. However, in viewing that surveillance video, the officers did not see a car stopping at the location at the time P.R. said it would appear.

An expert serologist with the State Police conducted a body fluid analysis from the sexual assault kit. The serologist detected sperm in the rectal and anal swabs, but found none in the oral, vaginal, pubic, and fingernail swabs. A DNA expert from the State Police found a match between the sperm sample and defendant's own DNA, which had been provided through a previous buccal swab.

The Suppression Hearing and the Subsequent Trial

Prior to trial, the judge reviewed a tape of a post-arrest interview Detective Valentin conducted of defendant. The judge also heard testimony from the detective at a suppression hearing. Based on the detective's failure to inform defendant of his charges before the questioning, the judge suppressed his statements from being admitted during the State's case-in-chief. However, because the judge found the statements were voluntarily given, she ruled

that she would allow the statements to be used for impeachment, if defendant chose to testify.[2]

As we have already noted, defendant elected to testify. On cross-examination by one of the two assistant prosecutors who tried the case as co-counsel, defendant was extensively questioned about his failure to provide the police with the exculpatory version of events that he had presented on direct examination.[3]

The jury deliberated for over a day before rendering its verdict. The jury found defendant not guilty of kidnapping, possession of a weapon for an unlawful purpose, unlawful possession of a weapon, and terroristic threats, but guilty of aggravated sexual assault and aggravated criminal sexual contact.

After the verdict, defendant moved for a new trial on the basis that the judge should have submitted lesser-included offenses to the jury. The judge denied that motion in an oral opinion.

Sentencing

The trial judge sentenced defendant on October 8, 2014. The judge merged the third-degree aggravated sexual contact count into the first-degree aggravated sexual assault count. The judge

---

[2] We discuss this in more detail, _infra_, in Part II(A).

[3] We discuss this cross-examination and defendant's associated claims of its impropriety, _infra_, in Part II(A).

granted the State's motion to impose an extended term because of defendant's status as a persistent offender.

The judge found that three aggravating sentencing factors applied: (3) the risk that defendant will commit another offense, N.J.S.A. 2C:44-1(a)(3); (6) the extent of defendant's prior criminal record and the seriousness of the offenses of which he was convicted, N.J.S.A. 2C:44-1(a)(6); and (9) the need for deterring defendant and others from violating the law, N.J.S.A. 2C:44-1(a)(9). The judge also found one mitigating factor: (11) the imprisonment of defendant would entail excessive hardship to himself or his dependents, N.J.S.A. 2C:44-1(b)(11). The judge observed that the "aggravating factors are extremely strong and outweigh the one mitigating factor." As we have already noted, the judge imposed on defendant a thirty-five-year custodial sentence, subject to the NERA parole disqualifier.

This appeal followed.

## II.

Defendant raises these points for our consideration:

> POINT I
>
> THE TRIAL COURT'S FAILURE TO INSTRUCT THE JURY AT ALL AS TO THE LAW REGARDING CONSENT DEPRIVED DEFENDANT OF HIS ONLY DEFENSE AND A FAIR TRIAL. (Not Raised Below).

10

POINT II

THE TRIAL COURT ERRED IN PERMITTING EXTENSIVE CROSS-EXAMINATION OF DEFENDANT ABOUT HIS FAILURE TO PROVIDE DETECTIVE VALENTIN WITH HIS EXCULPATORY VERSION OF EVENTS DURING HIS POST-ARREST INTERROGATION.

POINT III

THE FAILURE TO CHARGE SECOND-DEGREE SEXUAL ASSAULT AS A LESSER-INCLUDED OFFENSE OF FIRST-DEGREE AGGRAVATED SEXUAL ASSAULT, AND LESSER-INCLUDED OFFENSE OF THIRD-DEGREE AGGRAVATED CRIMINAL SEXUAL CONTACT WAS PLAIN ERROR BECAUSE SEXUAL PENETRATION OR CONTACT THROUGH USE OF PHYSICAL FORCE OR COERCION WITHOUT THE VICTIM SUSTAINING SEVERE INJURY WAS CLEARLY INDICATED IN THE RECORD.

POINT IV

THE THIRTY-FIVE YEAR DISCRETIONARY EXTENDED TERM SENTENCE IMPOSED WAS MANIFESTLY EXCESSIVE AND AN ABUSE OF THE LOWER COURT'S DISCRETION.

He amplifies the post-arrest silence argument in his reply brief,

as follows:

REPLY POINT I

THE LOWER COURT ERRED IN PERMITTING EXTENSIVE CROSS-EXAMINATION OF DEFENDANT ABOUT HIS POST-ARREST SILENCE BECAUSE HIS STATEMENT COULD NOT HAVE BEEN VOLUNTARY FOLLOWING THE A.G.D. VIOLATION -- THE DETECTIVE'S FAILURE TO ADVISE DEFENDANT OF THE PENDING CHARGES DEPRIVED HIM OF THE ABILITY TO MAKE A VOLUNTARY STATEMENT UNDER THE LAW (12T106-18 to 107-11; 4T70-23 to 71-1).

11                                              A-1518-14T4

III.

We discuss defendant's arguments in a reorganized and slightly different sequence.

A.

Defendant contends that the trial court erred in allowing one of the two assistant prosecutors who tried the case to cross-examine him extensively about his failure to present an exculpatory account of the underlying events during his post-arrest interrogation by Detective Valentin. For the reasons that follow, we agree with that contention.

1.

The relevant aspects of defendant's police interrogation and cross-examination at trial are as follows. As recounted by Detective Valentin at the suppression hearing, after P.R. reported the alleged sexual assault, the State Police requested Valentin to interview defendant based on a positive match between defendant's DNA and the victim's submitted sperm sample. Defendant was already in custody on an unrelated offense.

To facilitate the interview, Detective Valentin arranged for defendant to be brought on March 20, 2012 at 2:30 a.m. from the Passaic County Jail to the Passaic City Police Station. Defendant, still in handcuffs, was brought into an interview room at around

11:00 a.m. The detective administered Miranda[4] warnings, and defendant's restraints were removed before questioning began.

Notably, the detective did not inform defendant of the charges against him before reading him his rights under Miranda and proceeding with the interrogation. As the trial court correctly found, that critical omission violated the requirements set forth by our Supreme Court in State v. A.G.D., 178 N.J. 56, 66-69 (2003) (holding that police are obligated before interrogating persons that a criminal complaint or arrest warrant has been filed or issued against that person). The foundation of this principle is that the government's failure to so inform a suspect that such a criminal complaint or arrest warrant had been filed or issued "deprives that person of information indispensable to a knowing and intelligent waiver of [his] rights [to assert the privilege against self-incrimination]." Id. at 68. "Without advising the suspect of his true status when he does not otherwise know it, the State cannot sustain its burden . . . that suspect has exercised an informed waiver of rights, regardless of other factors that might support his confession's admission." Ibid.

Applying A.G.D., the trial judge properly ruled that defendant's responses to the detective's questions could not be

---

[4] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

A-1518-14T4

used affirmatively by the State against defendant in its case-in-chief.[5] However, the judge added a qualification that, if defendant elected to take the stand and testify in his own defense, the prosecution could cross-examine him about his responses to the detective as potential impeachment evidence. Defendant's trial counsel argued against this decision and later objected to this qualification at trial, but the objection was overruled.

During the detective's recorded interview of defendant, he asked defendant if he knew somebody by the name of P.R. Defendant replied that he never heard of her. The detective then alluded to defendant's detention and his brother's involvement in narcotics, and then asked defendant, "You want to tell me something?" Defendant replied, "No."

The detective pressed further and described how the alleged victim had been threatened at knifepoint, was taken to another location, and was sexually assaulted. Defendant responded, "I don't know anything about that." The detective urged defendant to cooperate with the investigation, noting that he did not "pick [defendant's] name out of a hat." He again asked defendant if he did the crime. Defendant repeated, "No." The detective then asked a general question as to how defendant "got around" the

---

[5] The State has not cross-appealed this aspect of the trial judge's ruling.

previous summer, to which defendant tersely replied in one word: "Foot."

The interview then turned to the DNA evidence that the detective said linked defendant to the victim. Once again, defendant denied knowing the alleged victim. He further denied the detective's accusation that he had picked up a woman, drove her into Newark, and had sex with her. The detective then confirmed that defendant "really [didn't] want to tell [him] anything."

At that point, the detective read to defendant standard language consenting to the provision of fresh buccal swabs, noting that he already had a judge's order compelling such swabs to be provided. One last time, the detective reiterated, "You're not going to tell me anything else? You don't have anything else to say to me?" Defendant remained uncommunicative, and the recorded interview terminated at that point.

Later at trial, defendant elected to take the stand and presented on direct examination his sex-for-drugs account of events. On cross-examination, an assistant prosecutor — as permitted by the court's pretrial ruling — repeatedly and pointedly challenged defendant about his failure to provide the sex-for-drugs narrative when he had been interrogated at the police station by Detective Valentin. Defense counsel objected repeatedly

throughout the cross-examination, but the judge overruled her argument that no prior inconsistent statements were being challenged.

The assistant prosecutor read through Detective Valentin's interview questions, which, as we have already shown, essentially consisted of P.R.'s account and defendant denying knowledge of those facts. The prosecutor then inquired of defendant whether the detective had asked him if he "knew anything about" the rape. Defendant agreed that he had told the detective "no."

The assistant prosecutor next went through defendant's positive DNA match. He noted that the detective had asked him "if something happened." Defendant responded that he told the detective "I don't know."

After presenting to the jury most of Detective Valentin's interview, the assistant prosecutor then challenged defendant, "You never said anything about having sex with a woman in exchange for drugs, did you? . . . Yes or no?" Defendant responded in the negative. Pressing him more, the prosecutor asked:

> You never said anything to the detective, you
> know what? I was out selling drugs that day,
> I was trying to make a living for my family,
> I had a little bit of drugs left. The woman
> offered me some sexual favors for drugs and I
> went with her. You never said that to him,
> did you?

16

Once again, defendant denied having volunteered such information during his police interview.

Following a brief recess, defense counsel requested the court to give the jurors a curative instruction about her client's right to not volunteer information to the police. Although the judge did not approve defense counsel's blanket request, the judge did agree that the prosecutor's specific query to defendant about not offering to speak again with the police after the interview should be stricken as improper. The jury returned and the judge issued a curative instruction on that discrete basis, advising the jurors that defendant had "a constitutional right to not speak again" to the detective and that they should not consider that particular failure to speak up in their deliberations.

After that instruction, the assistant prosecutor resumed cross-examining defendant about his failure to provide an exculpatory version of events during the police station interview. He posed this lengthy leading question:

> So, on March 20 of 2012, when you're sitting down and you're speaking to the detective and he's asking you questions in a calm, non-threatening, non-coercive situation, before he's even told you your charge, and he's asking you, and he's telling you that this information relates to the investigation, you don't tell him what you've told us today about a woman coming up to you and tricking and asking for sexual favors in return for drugs and that you were out drug dealing that day

and that the woman approached you; <u>you don't tell him any of that, right</u>?

DEFENDANT: Yes.

[(Emphasis added).]

Finally, the assistant prosecutor's cross-examination of defendant ended with the following exchange:

PROSECUTOR: When you told Detective Valentin, when you gave him the answers, he told you you were charged, and he told you about the scientific database, <u>you never gave him the story that you told today, did you</u>?

DEFENDANT: No.

PROSECUTOR: And that's because you thought you were going to get away with it, didn't you?

DEFENDANT: What? Excuse me?

PROSECUTOR: <u>That was because [sic] that you were going to get away with it, didn't you</u>?

DEFENSE COUNSEL: Judge, I have to object at this point.

DEFENDANT: Get away with what?

DEFENSE COUNSEL: I'm going to ask to be heard.

THE COURT: I will allow it. He is probing his state of mind at the time. I will allow it.

DEFENSE COUNSEL: I don't know if the question makes sense, if he even understands it.

THE COURT: Well, you have your argument. You have redirect. Overruled. Go ahead.

> DEFENDANT: I didn't think I was getting away with nothing, 'cause I didn't do nothing wrong.
>
> [(Emphasis added).]

During the final charge, the court explained to the jurors that they were permitted to consider defendant's responses during the detective's interview as prior statements that could affect his credibility. The judge advised the jurors in this regard to consider "such factors as to where and when the prior statement[s] occurred, and the reasons given, if any, therefore."

2.

On appeal, defendant urges that the State was improperly allowed to impeach him with his failure to present an exculpatory account of the incident during the post-arrest interview with Detective Valentin. He further argues that the assistant prosecutor unfairly capitalized on this erroneous ruling on cross-examination, thereby undermining his constitutional right to be silent and refrain from providing such a narrative to the investigating authorities.

The pertinent case law supports defendant's claim of error. In State v. Deatore, 70 N.J. 100, 115-16 (1976), the Supreme Court noted that it is "fundamental" in our State that a criminal suspect has the right to remain silent when in police custody or

19                                                              A-1518-14T4

interrogation, id. at 114, and that when such an individual expressly refuses to answer police queries, "no inference can be drawn against him under the doctrine of acquiescence or any other concept," id. at 115 (quoting State v. Ripa, 45 N.J. 199, 204 (1965)).

The Court amplified these principles in State v. Muhammad, 182 N.J. 551, 568 (2005), reiterating that a prosecutor may not refer to a defendant's silence while he was in police custody as a basis to infer his guilt. Similar to the present case, the prosecutor in Muhammad faulted the defendant, who was charged with a sexual assault, for failing to tell the police that the alleged sexual encounter was consensual. Id. at 566. The Court repudiated this tactic as "impal[ing] defendant on his silence[.]" Id. at 566-67. The Court reasoned that a jury should not be able to infer guilt from a suspect's silence, because we "cannot know whether a suspect is acquiescing to the truth of an accusation or merely asserting his privilege[.]" Id. at 567.

To be sure, our case law does recognize these principles are not without limitation. As the Supreme Court ruled in State v. Tucker, 190 N.J. 183, 189 (2007), "a defendant's right to remain silent is not violated when the State cross-examines a defendant on the differences between a post-Miranda statement and testimony at trial." When a defendant speaks, he has not remained silent.

Ibid. Therefore, it is not inappropriate for the State "to point out differences in the defendant's testimony at trial [if] his [earlier] statements [] were freely given." Ibid.

In Tucker, the defendant volunteered — in his third and final session with police interviewing him about the death of his mother — that he had taken her to the bank during the pertinent timeframe, a claim that he had not divulged in his first two interviews. Id. at 186-87. Given such circumstances, the Court held that it was permissible for the prosecution to point out at trial the inconsistencies in defendant's voluntary statements and other evidence at trial. Id. at 190. The State's use of such inconsistencies, the Court held, did not comprise "an unconstitutional comment on [a defendant's] silence." Ibid.

Very recently, the Supreme Court applied these general principles in State v. Kucinski, 227 N.J. 603 (2017).[6] In that case, the defendant was arrested for murder, given Miranda warnings, and then participated in an interview with the police. Id. at 608. The defendant insisted that he speak with the police "to tell [them] the truth," and he initially provided certain details. Id. at 622. However, as the interview progressed, the defendant refused to answer certain specific questions, conduct

---

[6] Counsel helpfully submitted to us supplemental briefs addressing Kucinski shortly after it was issued.

which the Court deemed to be "not an attempt to end the dialogue, but rather . . . 'part of an ongoing stream of speech[.]'" Id. at 623 (citing Bradley v. Meachum, 918 F.2d 338, 342 (2d Cir. 1990) cert. denied, 501 U.S. 1221, 111 S. Ct. 2835, 115 L. Ed. 2d 1004 (1991)). The Court held that the defendant waived his right to silence, and that any conflicts between his direct testimony at trial and his post-arrest statement were appropriate topics for cross-examination by the prosecutor. Id. at 623-24.

The situation here is markedly different from Tucker and Kucinski. For one thing, as the judge determined, defendant was not even duly informed of the charges against him until part-way through the interview. Beyond that flaw, a fair reading of the interview transcript as a whole supports defendant's argument that his responses to Detective Valentin essentially consisted of flat denials, interspersed with outright refusals to respond. Unlike the suspects in Tucker and Kucinski, defendant did not volunteer to the police an affirmative narrative, such as Tucker's alleged trip to the bank with his mother, see Tucker, supra, 190 N.J. at 186, or Kucinski's claim that the decedent, his brother, had threatened to kill him with a gun and had bitten him. See Kucinski, supra, 227 N.J. at 609-10. Here, as Detective Valentin literally remarked to defendant after peppering him with questions without success, he "really didn't want to tell him anything."

Although we appreciate the trial court's general sensitivity to defendant's constitutional rights and her conscientious efforts to impose boundaries on the prosecution, the State went too far here in emphatically criticizing defendant for not volunteering to Detective Valentin that he had consensual sex with P.R. after she had offered to exchange sex for drugs. The protracted cross-examination permitted by the court improperly failed to honor defendant's constitutional right to refuse to engage in a substantive dialogue with the interrogating officer.[7]

We further conclude that this violation of defendant's rights was not harmless error. The case largely hinged upon the credibility of P.R.'s version of events versus defendant's competing version. There were no eyewitnesses presented at trial. The surveillance video of the alleged location of the sexual assault failed to substantiate P.R.'s narrative. The knife allegedly used to threaten P.R. was never produced. Several details of her account were only claimed for the very first time in her direct examination at trial. The DNA testing did show that defendant had sexual contact with P.R., but that fact was not

---

[7] To be clear, we do not suggest that the assistant's prosecutor's cross-examination was in any way unprofessional, since his mode of impeachment had been expressly authorized in advance by the trial court. The assistant prosecutor did exactly what a zealous advocate might be expected to do in compliance with a court's ruling.

A-1518-14T4

disputed at trial.  What was hotly disputed were the actual series of events that led to the contact occurring.

In sum, this was a relatively close case on the facts, which turned greatly on the jury's assessments of the sexual actors' credibility.  The tenor and contents of the prosecution's blistering cross-examination of defendant likely made a difference in the jury's evaluation of which actor to believe.

We are mindful that the trial court issued well-intentioned instructions to the jurors, which were designed to contain the impact of the State's cross-examination to the impeachment of defendant's testimony.  Although such instructions surely would have been appropriate in a case in which a defendant had provided a contrary narrative to investigating officers, no such narrative was advanced by this defendant at the police station.  Instead, he provided no substantive information, except the incidental fact that he got around on "foot."  Even though the assistant prosecutor who presented the State's closing argument to the jury did not mention her colleague's cross-examination, she did not need to do so strategically, for presumably the damage had already been done through her partner's lengthy excoriation of defendant's silence.

In sum, we lack confidence that the error was inconsequential, and thereby direct that the case be tried anew.  See State v. Macon, 57 N.J. 325, 333 (1971); R. 2:10-2 (regarding the appellate

24

court's role in providing relief from trial errors that were "clearly capable of producing an unjust result"). At the new trial, the prosecution will be barred from presenting any evidence of defendant's responses to the detective's interrogation.

B.

Because we are ordering a new trial, we need not comment at length on the remaining issues. Nevertheless, we address them briefly for sake of completeness.

1.

Defendant claims that the final jury charge was flawed because it did not include an instruction about a sexual actor's consent. In addition, defendant separately argues that the trial judge should have included in the charge the elements of the lesser-included offenses of second-degree sexual assault, N.J.S.A. 2C:14-2(c)(1), and fourth-degree criminal sexual contact, N.J.S.A. 2C:14-3(b).

Significantly, none of these jury charges were requested by defendant before or during trial. Where, as here, a defendant does not object to jury instructions at a trial, the plain error standard of review applies. See, e.g., State v. Burns, 192 N.J. 312, 341 (2007). In addition, we must consider alleged errors in the jury charge in light of its totality, rather than in isolation. Ibid. (citing State v. Chapland, 187 N.J. 275, 289 (2006)). That

said, we are also mindful of the general principle that trial courts have "the independent duty" to provide jurors with "accurate instructions on the law as it pertains to the facts and issues of each case, irrespective of the particular language suggested by either party." State v. Reddish, 181 N.J. 553, 613 (2004). Applying these principles here, we discern no basis to grant defendant a new trial because of alleged flaws in the charge.

First, we reject defendant's argument that the trial court was obligated, sua sponte, to instruct the jurors as to the law of consent reflected in the model criminal charges. See Model Jury Charge (Criminal), "Aggravated Sexual Assault in the Course of a Felony: Consent Alleged, N.J.S.A. 2C:14-2(a)(3)" (2012). Such an instruction on consent was not required in the circumstances here, because this was a case in which the alleged victim contended that she was compelled to take part in sexual acts due to defendant's threats of violence or force. See State v. Jones, 308 N.J. Super. 174, 187 (App. Div.), certif. denied, 156 N.J. 380 (1998) (ruling that a consent instruction was not necessary in a case where the State contended that the defendant had kidnapped the victim and used force against her to sexually assault her); State v. Cuni, 303 N.J. Super. 584, 598 (App. Div. 1997), aff'd on other grounds, 159 N.J. 584 (1999) (holding, by contrast, that a consent instruction was necessary, given the factual dispute

concerning the mental capacity of the alleged victim to engage in the sexual conduct, and where the State did not allege that the defendant had used force or violence). See also In re M.T.S., 129 N.J. 422, 447-49 (1992) (noting that defense of consent is inapplicable to cases in which the State alleges "violence or force extrinsic to the act of penetration").

Nor was the trial court obligated to instruct the jurors, sua sponte, on the two lesser-included offenses that defendant did not posit until after the verdict was rendered. As a general proposition, unrequested jury charges on lesser-included offenses are only necessary where the facts and evidence "clearly indicate" a basis to support such an offense. State v. Carrero, ___ N.J. ___, ___ (2017) (slip op. 11); State v. Jenkins, 178 N.J. 347, 361 (2004).

Here, the proofs adduced at trial did not clearly indicate a sufficient evidential basis to charge the lesser-included offenses of non-aggravated sexual assault and sexual contact. The jury was presented with only two testimonial versions of the incident: P.R.'s account of her abduction at knifepoint and forced sexual assault versus defendant's claim that the sexual activity was the result of his acceptance of P.R.'s offer of sex for drugs. Either the jury was likely to believe defendant that the sex was not physically coerced, or alternatively believe P.R. that it was.

The evidence did not manifestly support a middle-ground possibility of non-aggravated sexual wrongdoing committed without any force or threat of violence. The mere fact that defendant was ultimately acquitted of kidnapping, terroristic threats, and weapons offenses does not retroactively compel the issuance of an instruction on lesser offenses that was never requested and one not "clearly" suggested by the evidence.

2.

Defendant's final argument that his extended-term sentence is manifestly excessive requires little comment. As the trial judge appropriately took into account, defendant has a substantial prior criminal record, including multiple felony convictions, and his commission of what the jury found to be his guilt of a first-degree offense warranted a lengthy custodial term. We discern no abuse of discretion in the judge's sound and detailed sentencing analysis, and therefore will not disturb it. State v. Case, 220 N.J. 49, 65 (2014); State v. Fuentes, 217 N.J. 57, 73 (2014). Had we upheld defendant's guilty verdict, the sentence would have been entirely justified.[8]

---

[8] To the extent that we have not already explicitly addressed them, all other arguments and sub-arguments raised on appeal by defendant lack sufficient merit to warrant discussion. R. 2:11-3(e)(2).

IV.

Defendant's judgment of conviction is reversed and remanded for a new trial, solely because of the prosecution's improper and highly prejudicial cross-examination impugning his failure to present an exculpatory narrative during post-arrest police interrogation. In all other respects, defendant's claims of error are rejected, and the trial court's rulings and overall handling of this matter are affirmed. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION