# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1295-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

HEATHER REYNOLDS, a/k/a
HEATHER L. KNECHT,
HEATHER L. WOLFENDEN,

    Defendant-Appellant.

_____

Submitted April 2, 2025 – Decided June 27, 2025

Before Judges Marczyk, Paganelli and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 21-07-1967.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Molly O'Donnell Meng, Designated Counsel, on the brief).

Grace C. MacAulay, Camden County Prosecutor, attorney for respondent (Jason Magid, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant, Heather Reynolds, was convicted by a jury of: murder, N.J.S.A. 2C:11-3(a)(1); endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(2); and possession of "a controlled dangerous substance" or controlled substance analog, N.J.S.A. 2C:35-10(a)(1). She appeals from those convictions contending: (1) the trial court abused its discretion by admitting improper lay witness opinion testimony and (2) prosecutorial misconduct committed in the prosecutor's summation to the jury. Applying well-established law, we conclude defendant's arguments have no merit and affirm.

To provide context to defendant's arguments, we briefly recite facts relevant to the appeal. On the night of May 9, 2018, defendant, her boyfriend, Domenic Caruso (Caruso), and Abel,[1] defendant's seventeen-month-old son were in defendant's home. According to defendant's statement to police she read to Abel, gave him a bottle and put him to sleep in his crib around 10:00 p.m. Defendant stated she noticed the "baby monitor" camera was missing. She texted her husband regarding the camera's whereabouts, but he said he had not seen it.

---

[1] We use a pseudonym out of respect for the deceased child victim.

A-1295-22

Defendant stated that about an hour later, Abel woke up and defendant and Caruso argued over who was going to rock Abel back to sleep. She said Caruso was initially rocking Abel and then defendant took over. Further, she stated Caruso left Abel's bedroom and closed the door. Reynolds stated she rocked Abel for about twenty minutes before he fell back asleep and she placed him in his crib. Defendant stated she then fell asleep on the couch.

Caruso told the police he was never in "possession" of Abel or held him or rocked him on the night of May 9. He testified that the last time he saw Abel was when defendant was giving Abel his bath. Caruso testified that he left defendant's home around 6:00 a.m.

Special Agent Willam Shute, of the Federal Bureau of Investigation, was qualified, without objection, "as an expert in the field of historical cell site analysis." He testified that according to Caruso's phone data, he was "out of [defendant]'s residence by 6:15 a.m.," "give or take." Further, according to Agent Shute, "the cell site analysis support[ed]" the other locations Caruso "relayed . . . he went to."

At approximately 10:00 a.m. on May 10, defendant's landlord came to the home. Defendant stated the landlord woke her up and when she "woke up . . . [Caruso] was gone."

A-1295-22

Defendant said she let the landlord into the home and "glanced in and saw [Abel] . . . was all right." Defendant "closed [Abel's bedroom] door gently and . . . proceeded . . . [with] the landlord." Thereafter, defendant tended to some chores.

Around 11:00 a.m., defendant went to Abel's room and could not wake him. She noticed "blood"; a "bruise or something" on Abel's face; Abel was "cold" and "smelled like rubbing alcohol."

Defendant ran with Abel's body to a neighbor's house. The neighbor called 9-1-1. A guest of the neighbor, Tatiana Hulyo (Hulyo), attempted CPR on Abel. Officer Nicholas Bersani arrived at the scene and began chest compressions. Officer Jason Sailer[2] and Officer Gary Lewitt also arrived at the scene.

Dr. Gerald Feigin, the Camden, Gloucester, and Salem County Medical Examiner was qualified, without objection, as an expert in field of forensic pathology. Dr. Feigin performed an autopsy on Abel. Dr. Feigin testified that Abel "died of asphyxia [with a] wipe containing . . . isopropyl alcohol and detergent [being] forcibly placed over the mouth and nose causing death, and

---

[2]  Jason Sailer is referred to as both Officer Sailer and Sergeant Sailer in the record.

the ma[nn]er of death is homicide." According to Dr. Feigin, "[G]lass [P]lus wipes" that were present at the place of death contained "isopropanol" and a "detergent." He opined that "isopropanol" evaporates "very rapidly" and he would not "expect to smell it even [fifteen], [thirty] minutes" after it had been applied. Dr. Feigin testified he did not "feel comfortable giving [a] time of death to a reasonable degree of medical certainty."

At trial, Tatiana Hulyo and the officers each testified as to their observations of defendant and their opinions regarding those observations. Defendant's trial strategy was to blame the murder on Caruso.

Defendant raises the following arguments for our consideration:

> POINT I. THE COURT ERRED BY PERMITTING FOUR WITNESSES TO OFFER IRRELEVANT AND PREJUDICIAL EXPRESSIONS OF LAY BELIEF IN DEFENDANT'S GUILT.
>
> POINT II. THE PROSECUTOR ENGAGED IN MISCONDUCT REQUIRING REVERSAL WHEN, IN SUMMATION, HE REPEATEDLY DENIGRATED THE DEFENSE AND EXPRESSED HIS PERSONAL BELIEF IN DEFENDANT'S GUILT.
>
> > i. THE PROSECUTOR IMPROPERLY DENIGRATED THE DEFENSE BY CALLING DEFENDANT A LIAR, ACCUSING DEFENDANT OF CONCOCTING AN ALIBI, AND CALLING THE DEFENSE A REHEARSED "STORY."

A-1295-22

ii. THE PROSECUTOR IMPROPERLY EXPRESSED HIS PERSONAL BELIEF IN DEFENDANT'S GUILT.

POINT III. THE CUMULATIVE EFFECT OF THE AFOREMENTIONED ERRORS DENIED DEFENDANT A FAIR TRIAL.

I.

Defendant argues the trial court impermissibly admitted testimony of "four witnesses to unfairly put their fingers on the scale by testifying that [defendant] was not believable." She contends that allowing the witnesses to testify that they "believed . . . defendant was faking her emotional reaction was impermissible lay opinion that should have been excluded."

Defendant contends:

> Officer Bersani testified that [defendant] crying "just wasn't genuine." . . . Hulyo testified, "it seemed to be as if she was crying, but no tears were coming out. It didn't seem genuine." Officer Lewitt testified that "anyone can fake cry" and Officer . . . Sailer testified, "I didn't believe she had a tear in her eye."

"We defer to a trial court's evidentiary ruling absent an abuse of discretion." State v. Garcia, 245 N.J. 412, 430 (2021). Therefore, "[a] reviewing court must not 'substitute its own judgment for that of the trial court' unless there was a 'clear error in judgment' -- a ruling 'so wide of the mark that a manifest

6

denial of justice resulted.'" State v. Scott, 229 N.J. 469, 479 (2017) (quoting State v. Perry, 225 N.J. 222, 233 (2016)).

Because defendant did not object to the testimony during the trial, we review for plain error. See State v. Singh, 245 N.J. 1, 13 (2021) ("When a defendant does not object to an alleged error at trial, such error is reviewed under the plain error standard."). "Under that standard, an unchallenged error constitutes plain error if it was 'clearly capable of producing an unjust result.'" Ibid. (quoting R. 2:10-2). Therefore, "the error will be disregarded unless a reasonable doubt has been raised whether the jury came to a result that it otherwise might not have reached." Ibid. (quoting State v. R.K., 220 N.J. 444, 456 (2015)).

N.J.R.E. 602 provides "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness' own testimony."

Under N.J.R.E. 701:

> If a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be admitted if it:
>
> > (a) is rationally based on the witness' perception; and

(b) will assist in understanding the witness' testimony or determining a fact in issue.

N.J.R.E. 401 defines "'[r]elevant evidence' [as] evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action." Unless otherwise excepted, "[a]ll relevant evidence is admissible." N.J.R.E. 402. One exception to the admission of relevant evidence is when "its probative value is substantially outweighed by the risk of: (a) [u]ndue prejudice, confusion of issues, or misleading the jury." N.J.R.E. 403(a).

Officer Bersani's and Officer Lewitt's testimony regarding defendant's emotional state was elicited during cross-examination. Nevertheless, defendant contends all the testimony was improperly admitted because "[t]hese witnesses clearly conveyed their opinion that [defendant] was a liar who was faking her emotional reaction to her son's death, and was therefore guilty of killing" Abel.

The State counters: (1) "it was only three witnesses not four who offered any testimony regarding defendant's emotional state. Specifically, defendant has argued Sergeant . . . Sailer testified, 'I didn't believe she had a tear in her eye' however, such testimony was never elicited from him but rather, was elicited from Officer Bersani"; (2) "the testimony which defendant has taken

issue with was not lay opinion but rather, fact testimony given it related to what the witnesses[] saw when interacting with defendant"; (3) to the extent the testimony offered lay opinion, "it was wholly permissible" because "it was based on the [officers'] respective perception of defendant[]" and "helpful"; and (4) defendant "elicited this now disputed testimony via cross-examination" and "utilized this testimony during closing arguments to attack the officers and the posture of the State's case."

We conclude the trial court did not misuse its discretion in admitting the testimony. The testimony was based on the witnesses' personal knowledge and conveyed the witnesses' physical observations of defendant not having any "tears." The testimony was permissible under Rule 602.

Defendant also contends the testimony of the witnesses that defendant's crying was "fake" or not "genuine" was impermissible opinion. We disagree.

In State v. Risden, the Supreme Court held "lay witnesses' testimony relating to defendant's physical appearance and her mental and emotional attitude and reactions within minutes before, at the time of, and after the shooting" "should not have [been] excluded." 56 N.J. 27, 40 (1970). The Court stated:

> Lay-witness opinion of the type described requires no expertise. It springs from the common understanding

9

and experience of mankind. It represents the reaction of an ordinary man arising from his observation and is helpful to an understanding of his testimony and an appreciation of the mental or emotional state of the person described.

[Ibid.]

Here, the opinion testimony was permissible under Rule 701.

Finally, we are satisfied the testimony was not "[u]ndu[ly] prejudic[ial]" under Rule 403(a), which states:

In order for relevant evidence to be excluded, it must be found that the evidence's probative value is "so significantly outweighed by [its] inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation of the basic issue of guilt or innocence."

[State v. Loftin, 146 N.J. 295, 358 (1996) (alteration in original) (quoting State v. Thompson, 59 N.J. 396, 421 (1971)).]

The witnesses' testimony did not have "inherently inflammatory potential," instead, the witnesses testified as to their observations and their opinions drawn from those observations. Ibid. Further, nothing in the testimony would have "divert[ed] the minds of the jurors from a reasonable and fair evaluation" of the evidence. Ibid.

A-1295-22

II.

"When an appellate court reviews a claim of prosecutorial misconduct with respect to remarks in summation, the issue presented is one of law. . . . [O]ur review is plenary and de novo." State v. Smith, 212 N.J. 365, 387 (2012). If the defendant does not object to the summation, as here, "we review [any] alleged impropriety for plain error." State v. Supreme Life, 473 N.J. Super. 165, 172 (App. Div. 2022). Generally, a plain error is one that is "clearly capable of producing an unjust result." R. 2:10-2.

"It is axiomatic that '[t]he duty of the prosecutor is as much . . . to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.'" Supreme Life, 473 N.J. Super. at 171-72 (alteration in original) (quoting State v. Williams, 244 N.J. 592, 607 (2021) (internal quotation marks omitted)). Therefore, "[w]hile 'prosecutors in criminal cases are expected to make vigorous and forceful closing arguments to juries' and are 'afforded considerable leeway,' 'their comments [should be] reasonably related to the scope of the evidence presented.'" Id. at 172 (second alteration in original) (quoting Williams, 244 N.J. at 607).

In addition, "even when a prosecutor's remarks stray over the line of permissible commentary, our inquiry does not end." Ibid. (quoting State v.

11

McNeil-Thomas, 238 N.J. 256, 275 (2019)).  Instead, "we weigh 'the severity of the misconduct and its prejudicial effect on the defendant's right to a fair trial,' and we reverse a conviction on the basis of prosecutorial misconduct only if 'the conduct was so egregious as to deprive defendant of a fair trial.'"  Ibid.  (quoting McNeil-Thomas, 238 N.J. at 275) (internal quotation marks omitted).

Our task is to "take into account the tenor of the trial and the degree of responsiveness of both counsel and the court to improprieties when they occurred."  Ibid.  (quoting Williams, 244 N.J. at 608).  "To warrant the remedy of a new trial, there must have been 'some degree of possibility that [the prosecutor's comments] led to an unjust result.'"  Ibid.  (alteration in original) (quoting McNeil-Thomas, 238 N.J. at 276).

In State v. Tucker, the New Jersey Supreme Court "h[e]ld that whether . . . asserted inconsistencies by a defendant are between two or more statements or between a statement and testimony at trial, the State may seek to impeach the validity of those statements."  190 N.J. 183, 190 (2007).

In Supreme Life, the "[d]efendant admitted lying to police in his statement."  473 N.J. Super. at 172.  The prosecutor used the admitted lie during summation.  In considering the prosecutor's use of this admission, we noted:  (1) "the prosecutor's opening salvo early in summation was defendant 'lied his rear

end off,'" ibid.; (2) the prosecutor used "defendant's admission . . . as a cudgel to explicitly argue defendant's testimony at trial was more lies told by an admitted liar," ibid.; and (3) "[i]n addition to simply calling defendant a 'liar' numerous times, the prosecutor wove the accusation into an attack on defendant's claims of self-defense and defense of another, seemingly blurring which party had the burden of proof." Id. at 173.

We stated "[d]efendant's false statements to police on the day of the incident were undoubtedly fair game for cross-examination and summation commentary." Id. at 174. However,

> while the prosecutor was entitled to draw the jury's attention to defendant's false statements to police when assessing the credibility of defendant's trial testimony, he was not permitted to tip the scale in the State's favor by repeatedly telling jurors that defendant's trial testimony was not worthy of belief because defendant lied before, was lying again and was, simply put, therefore a liar.
>
> [Id. at 175.]

Moreover, "[i]t is . . . improper for a prosecutor to use derogatory epithets to describe a defendant." Id. at 174. Use of words like "'coward,' 'liar,' or 'jackal' [are] . . . derogatory . . . [and] are especially egregious when . . . the prosecutor pursues a persistent pattern of misconduct throughout the trial." Ibid. (quoting

13                                                                                  A-1295-22

State v. Wakefield, 190 N.J. 397, 466-67 (2007) (internal quotation marks omitted)).

It is against the backdrop of this well-established law that we consider defendant's arguments that the prosecutor committed misconduct in his summation.

A.

Defendant contends the prosecutor committed misconduct because he "repeatedly told the jury in closing that [she] was a liar, that her defense was a carefully rehearsed 'story,' that she engaged in 'alibi building,' that he knew 'the truth' that [she] was the killer, and that it was 'impossible' for anyone else to have committed the murder." She argues "[t]hese comments 'substantially prejudice[d] the defendant's fundamental right to have a jury fairly evaluate the merits of [her] . . . defense,' requiring reversal."

Defendant recites the following purportedly improper comments:

> Now, she also texts her husband . . . asking about a baby monitor. . . And this is, you know, <u>what you could consider alibi building</u> saying, "And here's how I can prove it. I noticed it wasn't there and I texted my husband."
>
> . . . .
>
> <u>Or is this another example of alibi</u> going, "Look. I'm closing the door gently."

14

> How do we know she did it? Well, <u>we know because</u> <u>she lies</u> to the detectives . . . <u>she lies</u> to them. And <u>she</u> <u>lies</u> to them for very specific reasons.
>
> . . . .
>
> <u>She is playing the role.</u> <u>It's a role that she's rehearsed</u> of someone who does not know that her child is dead . . . her behavior only makes sense <u>if she has rehearsed</u> that role. . . .
>
> . . . .
>
> <u>This is a story</u> that she is, relatively, committed. As I suggest, that it's <u>a story that she's rehearsed</u>.

Defendant calculates "the prosecutor called the defense 'a story' twenty-one times."

In response, the State asserts "defendant's contention is entirely unfounded given the prosecutor's comments were properly related to the scope of the evidence presented at trial, and also, appropriately responsive to defense counsel's closing remarks." Therefore, the State contends, "in light of the tenor of the trial coupled by the fact defendant did not object at trial to the prosecutor's remarks . . . it cannot be said defendant was deprived of a fair trial."

We conclude these comments were not improper. The prosecutor used the word "liar" once and that was when he noted defendant "accus[ed Caruso] of

15

being a liar." In addition, our review of the prosecutor's summation does not reveal any of the epithets we noted were improper in <u>Supreme Life</u>.

Moreover, the prosecutor's summation was based in the evidence and in response to defendant's summation. Defendant attempted to portray herself as a victim and implied that her actions revealed her innocence. It was appropriate for the prosecutor to offer a "vigorous and forceful" rebuttal of defendant's portrayal. <u>Supreme Life</u>, 473 N.J. Super. at 172. Because we conclude the prosecutor's summation was not improper, we similarly conclude the prosecutor's summation did not result in an unfair trial or an unjust result.

B.

Defendant contends the prosecutor improperly stated:

> The truth in this case . . . Reasonable or not, horrible or not, the truth is that there's [defendant]'s hand over his face preventing any oxygen from entering his system and, ultimately, leading to his death,
>
>     . . . .
>
> . . . [I]t is not possible for anyone else to have killed that child. . . .[3]

---

[3] The trial transcript reveals the following: "There is one final thing I want to mention. And it's a fair question. All of the evidence at this point, has said it is not possible for anybody else to have killed that child."

Defendant contends this was inappropriate because a prosecutor may not "repeatedly call[] . . . defendant a liar" nor state "defendant was 'definitely guilty of the murder,'" citing Supreme Life. Defendant asserts the prosecutor's mention that "it [wa]s not possible for anyone else to have killed that child" was "particularly egregious because it was entirely possible for Caruso to have killed" Abel.

The State counters that defendant takes the quoted statement out of context. The State asserts the prosecutor's complete statement was:

> Because the truth, in this case – I believe that defense counsel said it doesn't stand to reason. Reasonable or not, horrible or not, the truth is that there's [defendant]'s hand over his face preventing any oxygen from entering his system and, ultimately, leading to his death.[4]

In addition, the State argues defendant's quoted statements appear "nearly [fifty] pages" apart in the trial transcript. The State offers that defendant's omission leaves "out . . . nearly [fifty] pages where the prosecutor discussed, based on the evidence at trial, why it was defendant who killed her child and not . . . Caruso." Moreover, the State notes "defense counsel focused on the fact

---

[4] Defense counsel's statement was: "It just does not stand to reason that a social worker with a degree and a family and a modest and well[-]appointed house full of toys and food and pictures of each other and love can kill that baby . . . ."

. . . Caruso was responsible and not defendant."  Therefore, the prosecutor "responded in kind."

Our review of the trial transcript reveals defense counsel stating in his summation:

> [I]mportantly, I don't have to prove that . . . Caruso did do this.  But I have not made it a secret.
>
> All of my questions have pointed to him.  When I opened to you, I told you why I was going to do it.  This isn't a thing where I'm trying to trick you.  I'm not playing hide the ball.  There is far greater evidence to suggest Caruso is the problem and that [defendant] is the victim of the crime.

We conclude the prosecutor's statement was not improper.  The statement, "it is not possible for anybody else to have killed that child," falls far short of the improper statement in Supreme Life where "the prosecutor told jurors his personal opinion that defendant 'is definitely guilty of the murder.'"  Id. at 173.

Instead, here, the statement was reasonably related to the evidence and in direct response to defendant's attempt to blame another.  Because we conclude the prosecutor's statement was proper, we similarly conclude it did not result in an unfair trial or lead to an unjust result.

A-1295-22

## III.

Finding no merit in defendant's arguments as to the witnesses' testimony or prosecutorial misconduct, we similarly conclude there is no merit to defendant's argument that the cumulative effect of those issues requires a new trial.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

A-1295-22